ARIELLA OMHOLT GUARDI (IL Bar No. 6297336)
Email:  guardia@sec.gov
CHARLES J. KERSTETTER (PA Bar No. 67088)
Email:  kerstetterc@sec.gov
JONATHAN A. EPSTEIN (IL Bar No. 6237031)
Email:  epsteinjo@sec.gov
United States Securities and Exchange Commission
175 West Jackson Blvd., Suite 1450
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Attorneys for Plaintiff
United States Securities and Exchange Commission

LOCAL COUNSEL
Donald W. Searles (Cal. Bar No. 135705)
Email:  searlesd@sec.gov
United States Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:22-cv-04119 |
| Plaintiff, | |
| v. | **COMPLAINT** |
| WESTERN INTERNATIONAL SECURITIES, INC., NANCY COLE, PATRICK EGAN, ANDY GITIPITYAPON, STEVEN GRAHAM, and THOMAS SWAN, | <u>**JURY DEMAND**</u> |
| Defendants, | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## <u>JURISDICTION AND VENUE</u>

1.     The SEC brings this action pursuant to authority conferred on it by Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin the defendants Western

International Securities, Inc. ("Western"), Nancy Cole, Patrick Egan, Andy Gitipityapon, Steven Graham, and Thomas Swan (together, "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.

2.     The Court has jurisdiction over this action pursuant to Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e).

3.     Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

4.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

5.     There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this complaint, and transactions, acts, practices and courses of business of similar purport and object.

## **SUMMARY**

6.     This matter concerns violations by Western and five of its registered representatives of the Best Interest Obligation under Rule 15*l*-1(a) of the Securities Exchange Act of 1934 ("Regulation Best Interest" or "Reg BI") in connection with their recommendations to retail customers to purchase an unrated debt security known as an L Bond.

7.     L Bonds were corporate bonds offered by GWG Holdings, Inc. ("GWG").  L Bonds were high risk, illiquid, and only suitable for customers with substantial financial resources.  The L Bonds relevant to this Complaint paid fixed interest rates of between 5.50% and 8.50%, depending on the maturity period of the

bond.  GWG offered maturity periods of two, three, five, or seven years.

8. Between July of 2020 and April of 2021, registered representatives of Western recommended and sold approximately $13.3 million in L Bonds to retail customers.

9. These recommendations violated Regulation Best Interest in several ways.  Regulation Best Interest requires that a broker, dealer, or associated person act in the best interest of a retail customer when making a recommendation of a securities transaction ("Reg BI's Best Interest Obligation").  Firms comply with Reg BI's Best Interest Obligation only if they comply with four component obligations ("Reg BI's Component Obligations"): the Disclosure Obligation, the Care Obligation, Conflict of Interest Obligation, and the Compliance Obligation.  Similarly, associated persons of broker-dealers comply with Reg BI's Best Interest Obligation only if they comply with the Disclosure Obligation and the Care Obligation.

10. Reg BI's Care Obligation requires a broker, dealer, or associated person of a broker or dealer, in making a recommendation of a securities transaction, to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

11. Western and its registered representatives Nancy Cole, Patrick Egan, Andy Gitipityapon, Steven Graham, and Thomas Swan (together, the "Registered Representative Defendants") failed to comply with this aspect of their Care Obligation, because they failed to exercise reasonable diligence, care, and skill to understand the risks, rewards, and costs associated with L Bonds.  At the time they recommended L Bonds to retail customers, the Registered Representative Defendants did not understand key risks associated with L Bonds and GWG.

12. Reg BI's Care Obligation also requires a broker, dealer, or associated person, in recommending a securities transaction to a retail customer, to exercise reasonable diligence, care, and skill to have a reasonable basis to believe the recommendation is in the best interests of that customer, based on the customer's

investment profile and the potential risks, rewards, and costs associated with the recommendation.  Defendants failed to comply with this component of the Care Obligation as well, by recommending L Bonds to at least seven retail customers without a reasonable basis to believe L Bonds were in those customers' best interests.  Among other things, these customers had moderate-conservative or moderate risk tolerances, investment objectives that did not include speculation, limited investment experience, limited liquid net worth, and/or they were retired.  The Registered Representative Defendants nevertheless recommended L Bonds to these seven customers without reasonable bases for doing so.

13.     Reg BI's Compliance Obligation, another Component Obligation of the Best Interest Obligation, requires brokers or dealers to (a) establish, (b) maintain, and (c) enforce written policies and procedures reasonably designed to achieve compliance with Reg BI.  Western failed to comply with its Compliance Obligation. Its written policies and procedures were not reasonably designed to achieve compliance with Reg BI's Care Obligation.  Western's written policies and procedures merely recited the objectives of Reg BI, without offering registered representatives specific guidance tailored to Western's operations.  Western also had inadequate procedures for enforcing what limited policies it had regarding compliance with the Care Obligation of Reg BI.

14.     The SEC brings this civil enforcement action seeking permanent injunctions, disgorgement and prejudgment interest, and civil penalties against Western and the Registered Representative Defendants, based on their violations of Rules 15*l*-1(a)(1) of the Exchange Act, and, in the alternative, against Western as a control person pursuant to Section 20(a) of the Exchange Act.

## DEFENDANTS

15.     **Western International Securities, Inc. ("Western")** is a California corporation with is headquarters in Pasadena, California.  It is registered with the Commission as an investment adviser and a broker-dealer.  Through its registered

representatives and advisers, Western sells various securities to retail customers, including alternative investments, such as L Bonds.  As of May 2020, Western is owned by Atria Wealth Solutions, Inc. ("Atria"), a wealth management solutions holding company.

16.    **Nancy Cole**, age 74, is a resident of Sacramento, California.  Cole has worked as an independent contractor for Western as a registered representative since August 2008.

17.    **Patrick Egan**, age 56, is a resident of Alhambra, California.  Egan has worked as an independent contractor for Western as a registered representative since 1998.

18.    **Andy Gitipityapon**, age 46, is a resident of Sherman Oaks, California. Gitipityapon, has worked as an independent contractor for Western office as a registered representative since April 2018.

19.    **Steven Graham**, age 61, is a resident of Santa Clarita, California. Graham has worked as an independent contractor for Western as a registered representative since September 2020.

20.    **Thomas Swan**, age 62, is a resident of Acme, Washington.  Swan has worked as an independent contractor for Western as a registered representative since May 2008.

## **RELATED ENTITIES**

21.    **GWG Holdings, Inc.** ("GWG") is a publicly traded company (NASDAQ: GWGH) that has its principal executive offices in Dallas, Texas.  Prior to 2018, GWG, through its various subsidiaries, acquired life insurance policies on the secondary market.  Following a series of transactions with Beneficient Company Group, L.P. in 2018 and 2019, GWG's business changed to focus on providing liquidity to holders of illiquid investments and alternative assets.

22.    **Beneficient Company Group, L.P.** ("Beneficient"), is a Dallas, Texas based company.  Although Beneficient was formed in 2003, it has only been

operating its current business model – providing liquidity to owners of alternative assets and illiquid investments – since September 2017.  Following a series of transactions in 2018 and 2019, Beneficient's management gained control over GWG, and Beneficient became a wholly-owned subsidiary of GWG.

## **FACTS**

## I.    **GWG L Bonds Are a High-Risk, Illiquid Investment.**

23.    GWG is a financial services company.  Prior to 2018, GWG's business model involved acquiring, through its various subsidiaries, life insurance policies in the secondary market.  That is to say, GWG purchased life insurance policies from consumers who owned life insurance they no longer wanted or needed.  GWG purchased the policies then continued to pay the premiums and collected the policy benefits upon the insured's death.

24.    In 2018 and 2019, GWG consummated a series of transactions with Beneficient that resulted in a significant reorientation of its business.  Beneficient's management gained control over GWG, Beneficient became a wholly-owned subsidiary of GWG, and GWG's business model changed.  Specifically, GWG stopped acquiring life insurance policies and focused instead on Beneficient's still-developing business model.

25.    Beneficient was formed in 2003 but began its current business model in September 2017.  Since then, Beneficient has been in the business of offering, through its subsidiaries, loans, other liquidity products, and related services to customers holding illiquid alternative assets.  In other words, it extends loans collateralized by cash flows from illiquid alternative assets, and provides services to trustees who administer the collateral.

26.    Since 2012, GWG has raised funds for its operations by selling corporate bonds – initially called Renewable Secured Debentures, but since 2015 known as L Bonds – to retail customers through a network of broker-dealers.

27.     A corporate bond is a debt obligation, like an "IOU."  Customers who buy corporate bonds are lending money to the company issuing the bond.  In return, the company promises to pay interest on the principal and to return the principal when the bond comes due, or "matures."

28.     Since 2012, GWG has offered L Bonds in four separate offerings: (1) an offering of up to $250 million in L Bonds beginning January 2012, (2) an offering of up to $1 billion in L Bonds beginning in January 2015, (3) an offering of up to $1 billion in L Bonds beginning in December 2017, and (4) an offering of up to $2 billion in L Bonds beginning in June 2020.  The L Bonds relevant to this Complaint are from the fourth offering.

29.     L Bonds sold in the fourth offering had terms of two, three, five, and seven years, and they paid fixed interest rates of between 5.50% and 8.50%, depending on the maturity.  The minimum investment was $25,000.

30.     GWG has sold nearly $2.0 billion in L Bonds since it began selling them in 2012.  GWG sold approximately $453 million in L Bonds in the fourth offering. As of September 30, 2021 (the most recent data GWG made available) GWG had $1.3 billion in L Bonds outstanding.

31.     The offering document GWG used for the fourth bond offering (the "2020 Prospectus") was 40 pages long and contained information about GWG and L Bonds.

32.     The 2020 Prospectus expressly incorporated by reference certain documents, including GWG's Form 10-K for the year ended December 31, 2019 and GWG's Form 10-Q for the quarter ended March 31, 2020.

33.     The 2020 Prospectus disclosed several risks associated with L Bonds. Among other things, investing in L Bonds involves a "high degree of risk, including the risk of losing [one's] entire investment[,]" and "[i]nvesting in L Bonds may be considered speculative."

34.     In addition, L Bonds are an illiquid investment.  No market for L Bonds

exists, and no such market is expected to develop.  If a market for L Bonds does not develop, customers may not be able to sell their L Bonds for the price they paid or at all.  As such, as GWG disclosed on the second page of the 2020 Prospectus, "**L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment**." (emphasis in original.)

35.    Unlike many corporate bonds, L Bonds are not rated by any bond rating agency.  Bond rating agencies assign letter grades (*e.g.*, AAA, B, C) to bonds based on their evaluation of the credit risk associated with the bonds' issuer.  No independent rating agency has rated L Bonds.

36.    GWG has a history of net losses and has not generated sufficient operating and investing cash flows to fund its operations.  For the year ended December 31, 2019, GWG posted a net loss from operations of $79.6 million and negative operating cash flow of $142.8 million.  GWG depends on financing – primarily debt financing, such as L Bonds – to fund its operations.

37.    Beneficient has a limited operating history and generated net losses from operations of $166 million and $167 million for the years ending December 31, 2018 and December 31, 2019, respectively.

38.    GWG's largest asset as of December 31, 2019, was Beneficient's goodwill ($2.4 billion), which constituted 65% of GWG's consolidated assets at that time.  Goodwill is an intangible asset that arises when a buyer acquires an existing business, representing the excess consideration paid by the buyer for the business over the acquired business' identifiable net assets.  Beneficient recorded this goodwill when GWG obtained control of it on December 31, 2019.  Eliminating goodwill, which is an intangible asset that cannot be used to pay down debt, GWG's liabilities are well in excess of its assets.

39.    GWG's largest tangible asset is its portfolio of life insurance policies, which had a face value of approximately $2 billion and fair value of $796 million as of December 31, 2019.  However, L Bonds are not directly secured by GWG's life

insurance portfolio.  Instead, L Bonds are primarily secured by GWG's equity ownership interests in certain GWG subsidiaries.  The claims of L Bond holders to assets, such as GWG's portfolio of life insurance policies, are subordinate to the interests of creditors of those entities.  L Bond holders' claims to GWG's life insurance assets are subordinate to a senior credit facility, which holds a direct security interest in GWG's life insurance portfolio.  The fair value of GWG's life insurance portfolio, less the amounts owed on the senior credit facility, is insufficient to repay GWG's outstanding L Bond debt.

## II.   GWG Suspended Sales of L Bonds.

40.    GWG temporarily ceased its sale of L Bonds in April of 2021 because it was unable to file its 2020 Form 10-K.  GWG subsequently filed its Form 10-K for the year ended December 31, 2020 on November 5, 2021 and resumed selling L Bonds.

41.    On January 15, 2022, GWG filed a Form 8-K disclosing that following its resumption of L Bond sales, GWG had "experienced significantly lower L Bond sales than it had experienced previously" and that it "did not make the January 15, 2022 interest payment of approximately $10.35 million and principal payments of approximately $3.25 million with respect to its L Bonds…."  In that same filing, GWG stated it had suspended further sales of L Bonds as of January 10, 2022.

42.    On April 20, 2022, GWG filed for Chapter 11 bankruptcy.  *In re: GWG Holdings, Inc., et al.*, Case No. 22-90032 (Bankr. S.D. Tex.).

## III.   Requirements of and Commission Guidance Regarding Reg BI

43.    Reg BI, which became effective on June 30, 2020, established a standard of conduct for broker-dealers and associated persons when they recommend securities transactions to retail customers.

44.    The SEC issued a 175-page adopting release, offering guidance on how the Commission interprets Reg BI.  *See* Regulation Best Interest: The Broker-Dealer

Standard of Conduct, Exchange Act Release No. 34-86031, 84 Fed. Reg. 33318 (July 12, 2019) (the "Adopting Release").

45.     Reg BI's Best Interest Obligation requires a broker, dealer, or a natural person associated with a broker or dealer, when making a recommendation of any securities transaction to a retail customer, to act in the best interest of that retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or associated person ahead of the interest of the retail customer.

46.     The Best Interest Obligation is satisfied only by compliance with four Component Obligations: (1) Disclosure Obligation, (2) Care Obligation, (3) Conflict of Interest Obligation, and (4) Compliance Obligation.

47.     The Care Obligation requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with a recommendation of a securities transaction to a retail customer.

48.     The Adopting Release states that what constitutes reasonable diligence depends on, among other things, the complexity of, and risks associated with, the recommended security.

49.     The Care Obligation also requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to have a reasonable basis to believe that their recommendation is in the best interest of the particular retail customer, based on that customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

50.     The Adopting Release states that what is in the best interest of a retail customer depends on the facts and circumstances of the recommendation, including "matching" the recommended security to the retail customer's investment profile. Where the "match" between the retail customer profile and the recommendation appears less reasonable, it is more important for the broker to establish that it had a

reasonable belief that the recommendation was in the best interest of the retail customer.

51.    The Adopting Release also states that, in addition to "matching" the recommendation to the customer's suitability profile, a registered representative should also exercise reasonable diligence, care, and skill to consider reasonably available alternatives.

52.    BI's Compliance Obligation requires a broker-dealer to establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with Reg BI.  According to the Adopting Release, a broker "should consider the nature of that firm's operations and how to design such policies and procedures to prevent violations from occurring, detect violations that have occurred, and to correct promptly any violations that have occurred."

IV.    **Defendants' Conduct in Selling L Bonds to Retail Customers**

53.    Western employed numerous registered representatives, such as the Registered Representative Defendants.  Western exercised control over the registered representatives by supervising their activities.

54.    Between July of 2020 and April of 2021, registered representatives of Western recommended and sold approximately $13.3 million in L Bonds to retail customers who were natural persons or the legal representative of a natural persons and who used the recommendation primarily for personal, family, or household purposes.

A.    **Due Diligence and Training**

55.    Prior to adding the June 2020 issuance of L Bonds to its list of approved investments for registered representatives to recommend, Western's Chief Compliance Officer ("CCO") performed due diligence.  Among other things, the CCO reviewed GWG's most recent Form 10-K and a due diligence report drafted by a third party ("Due Diligence Report").

56.     The Due Diligence Report contained detailed analysis of the risks and rewards of L Bonds.  However, the Chief Compliance Officer did not provide the Due Diligence Report to Western registered representatives, supervisors, or other compliance personnel.

57.     Although the 2020 Prospectus expressly stated L Bonds were only suitable for customers with "substantial financial resources," Western did not set any criteria or thresholds for its customers to invest in L Bonds.  Western also did not restrict the sale of L Bonds to customers with certain risk profiles or investment objectives.

58.     Prior to recommending them to customers, Western required each of its registered representatives to take an online training course on L Bonds.  However, Western did not require registered representatives to take L Bond training on the current L Bond offering if they had already taken a training for one of the prior issuances of L Bonds, notwithstanding the significant changes in GWG's business and finances following its transactions with Beneficient.

**B.     Recommendation Process**

59.      When one of their customers purchased L Bonds, Western registered representatives completed a client disclosure form for alternative products (the "Client Disclosure Form").  These forms, which were a single page, contained information about the proposed investment, including the investment amount and the percentage of the customer's net worth (defined as total assets exclusive of home, home furnishings, and automobiles, minus total liabilities) and liquid net worth the investment would comprise, as well as a "rationale" for the recommended investment.

60.     Western customers and their registered representatives also completed a two-page Western client agreement (the "WIS Agreement"), which contained information about the customer's age, occupation, income, investment objectives,

risk profile, and investing knowledge, among other things.

61.     For L Bonds, Western customers and their registered representatives also filled out a GWG Bond Purchase Form.  The GWG Bond Purchase Form contained information about the customers' L Bond investment, including the dollar amount and the term.  They also contained information about the customer, including the total amount of alternative or illiquid investments the customer held and the percentage of the customer's liquid net worth that would be invested in alternative or illiquid investments after their L Bond purchase.

62.     The customer's Client Disclosure Forms, current WIS Agreement, and GWG Bond Purchase Form were then reviewed and signed by a Western supervisor or the supervisor's delegate.

63.     The supervisor's, or the supervisor's delegate's, review consisted of ensuring the forms were filled out completely and verifying the L Bond investment did not exceed 10% of the customer's net worth.

64.     After the supervisors' review, the transaction paperwork was submitted to Western's compliance department for what they called "recordkeeping and surveillance."  Western's compliance department verified the required documents had been submitted, there was no missing information or signatures on the forms, and that an explanation was provided if the purchase exceeded 10% of the customer's net worth.  Western's compliance department did not examine whether an investment was in the customer's best interest.

**C.     Financial Compensation**

65.     Western received a commission of 3.25-5% of the value of each L Bond sold by its registered representatives.  The registered representative received approximately 85-90% of that commission, Western received approximately 10%, and sometimes the registered representative's supervisor received a small percentage.

66.     In addition, Western received a fee of .75% of the total value of each 2-

and 3-year L Bond it sold and 1% of the total value of each 5- and 7-year L Bond it sold.

67.     Defendants Cole, Egan, Gitipityapon, Graham, and Swan received aggregate commissions each of between approximately $5,400 and $32,500 for their post-June 30, 2020 sales of L Bonds.

68.     Western received approximately $187,000 in commissions and fees for L Bond sales made after June 30, 2020.

**V.      The Registered Representative Defendants Sold L Bonds without Adequately Understanding the Risks Associated with the Investment.**

69.     The Registered Representative Defendants each sold L Bonds pursuant to the 2020 Prospectus.  Their sales are summarized in the chart below:

| Registered Representative | L Bond Sales July 2020 – April 2021 | Commissions from L Bond Sales July 2020 – April 2021 |
|---|---|---|
| Nancy Cole | $250,000 | $10,080 |
| Patrick Egan | $184,500 | (*at least*) $5,397 |
| Andy Gitipityapon | $330,000 | $9,548 |
| Steven Graham | $1,061,400 | $32,424 |
| Thomas Swan | $297,000 | $12,555 |

70.     These registered representatives recommended L Bonds to retail customers, despite having an insufficient, and sometimes erroneous, understanding of the investment.

71.     The Registered Representative Defendants' knowledge of GWG and L Bonds was based on information and communications from GWG and its sales representatives.

72.     Although all of the Registered Representative Defendants took a training course on GWG L Bonds, four of them (Cole, Gitipityapon, Egan, and Swan) took that training on a prior issuance of L Bonds, not those sold pursuant to the 2020

Prospectus.

73.     Although Western's CCO received the Due Diligence Report, the CCO did not share the report or its contents with Western's registered representatives. None of the Registered Representative Defendants received or reviewed the Due Diligence Report.

74.     Each of the Registered Representative Defendants misunderstood important issues regarding GWG and L Bonds, as described below.  Each of these issues were disclosed by GWG in the 2020 Prospectus and/or in its public filings, which were incorporated therein.

**A.     Business Combination with Beneficient**

75.     As described above and as disclosed in the 2020 Prospectus, GWG's transactions with Beneficient resulted in a "significant reorientation" of GWG's business.  After those transactions, GWG was no longer in the business of purchasing life insurance policies on the secondary market.  Rather, GWG adopted Beneficient's business model of offering loans, other liquidity products, and related services to customers holding illiquid alternative assets.

76.     Despite the significance of this change, and its disclosure in the 2020 Prospectus, several Registered Representative Defendants failed to use reasonable diligence, care, and skill to understand the business combination with Beneficient, Beneficient's business, or the impact of that business combination on the L Bonds' risk.

77.     For example, Defendant Cole did not know about the business combination with Beneficient until several months after she had recommended L Bonds to customers.  At the time she sold $250,000 worth of L Bonds to Customers B and C, she believed GWG was continuing to invest in life insurance policies.

78.     Swan also erroneously believed that GWG was continuing to invest in life insurance policies.

79.     Defendant Egan also failed to understand GWG's transactions with

Beneficient, erroneously believing that they were not significant.

80.    Defendant Graham understood that there had been a change in GWG's business, but he did not adequately undertake to gain an understanding of Beneficient's business or assets.

## B.    Risk Profile of GWG L Bonds

81.    As described above and as disclosed in the 2020 Prospectus, investing in L Bonds involves a "high degree of risk," including the risk of losing one's entire investment.  The 2020 Prospectus further states investing in L Bonds "may be considered speculative."  Notwithstanding these disclosures, several of the Registered Representative Defendants did not understand the risk of L Bonds.

82.    For example, defendants Cole and Swan both did not consider L Bonds to be high risk, instead describing them as relatively safe.

83.    Defendant Egan, on the other hand, acknowledged that the 2020 Prospectus described the L Bonds as high risk, but disregarded that disclosure.

## C.    Collateral Securing L Bonds

84.    As described above and on the first page of the 2020 Prospectus, GWG L Bonds are not directly collateralized by life insurance policies.  Rather, they are primarily secured by GWG's equity ownership interests in certain GWG subsidiaries. Although certain of those subsidiaries held life insurance policies, the L Bond investors' claims to those policies were subordinate to the interests of creditors of those entities.  Put another way, other creditors had first claim on those life insurance policies, not the L Bond investors.  This was important, because the value of GWG's life insurance portfolio was not sufficient to repay all of GWG's outstanding debt.

85.    However, defendants Gitipityapon, Swan, and Egan did not understand the nature of the collateral for L Bonds.  They failed to appreciate the life insurance policies themselves did not collateralize the bonds.

## D.    Beneficient's Profitability

86.    As described above, both GWG and Beneficient had histories of

substantial net losses.  These net losses were readily apparent in GWG's 2019 Form 10-K filing, which was incorporated into the 2020 Prospectus.

87.     However, several of the Registered Representative Defendants knew little, if anything, about Beneficient's finances, including its history of operating losses, and did nothing to educate themselves.

88.     For example, Egan acknowledged that he should have reviewed Beneficient's financial statements and admitted he did not do so, but rather erroneously assumed that Beneficient was profitable.

89.     Defendant Gitipityapon did not know how Beneficent made its money or whether it was generating revenues and did nothing to determine if it was.

## VI.     The Registered Representative Defendants Recommended L Bonds to Retail Customers Without a Reasonable Basis to Believe the Investments Were in those Customers' Best Interest.

90.     The Registered Representative Defendants recommended L Bonds without a reasonable basis to believe they were in the best interests of at least seven retail customers.

91.     For the reasons discussed above, L Bonds might be appropriate for certain customers willing to accept a substantial degree of risk, who are interested in investing in something that could be considered to be speculative, and who have substantial financial resources and no need for liquidity.  However, the Registered Representative Defendants recommended L Bonds to customers who fell outside those parameters.

92.     Given the mismatch between these customers and the high-risk L Bonds, these Registered Representative Defendants did not demonstrate reasonable diligence, care, or skill in determining that the L Bonds were in their customers' best interests.

### A.     Customer A

93.      Defendant Graham recommended L Bonds to a retail customer who

purchased $100,000 in two-year L Bonds in or around November 2020 ("Customer A").

94.     Customer A was a 79-year-old retired truck driver with a moderate risk tolerance whose investment objectives did not include speculation.  Customer A had limited general investment knowledge and limited knowledge of bonds.  At the time of his L Bond purchase, Customer A's annual income was $35,000 and his liquid net worth was $300,000.  The L Bond investment comprised 10% of Customer A's net worth and 33% of his liquid net worth.

95.     Customer A made his L Bond investment in his individual retirement account and planned to use the L Bond investment primarily for personal use.

96.     In the "rationale" section of the Client Disclosure Form for Customer A's L Bond investment, defendant Graham wrote, in full:  "Customer is seeking a higher rate of interest from funds sitting in a bank savings at .05%. They will utilize the interest for supplemental income each month."

97.     Nowhere did defendant Graham document why he believed L Bonds specifically were in Customer A's best interest or why he chose to recommend L Bonds to Customer A as opposed to the many other investments that offered greater than .05% interest rates.

98.     Defendant Graham's bases for believing that $100,000 L Bond purchase was in Customer A's best interest were unreasonable, vague, and generic.  Defendant Graham did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer A were in Customer A's best interest.

99.     Neither defendant Graham's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns with Customer A's L bond investment.

**B.     Customers B and C**

100.    Defendant Cole recommended L Bonds to a married couple of retail

customers ("Customer B" and "Customer C").  Customers B and C collectively purchased $250,000 in two-, three-, five-, and seven-year L Bonds in or around December 2020.

101.   At the time of the recommendation, Customers B and C were 67 and 61 years old, respectively.  Customer B was retired.  Although their WIS Agreements listed their risk tolerance as moderate, defendant Cole described them as "not risk takers," and "relatively conservative."  Customers B and C had investment objectives that did not include speculation.  They had limited general knowledge and limited knowledge of bonds.  According to their WIS Agreements, Customers B and C collectively had an annual income of $106,000 and a liquid net worth of approximately $760,000.  The L Bond investments comprised 12% of the net worth and 33% of the liquid net worth of Customers B and C.

102.   Customers B and C made their L Bond investments in their personal retirement accounts and a joint investment account, and they planned to use proceeds from the L Bond investment primarily for personal use.

103.   Defendant Cole's bases for believing $250,000 in L Bonds were in Customers B and C's best interest were unreasonable.  Her bases included L Bonds' good returns and her understanding that the L Bonds were not too risky.  However, defendant Cole's understanding of L Bonds' risk profile was based on her misunderstanding of GWG's business and the collateral for L Bonds, described above.  Accordingly, defendant Cole did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe her recommendation of L Bonds to Customers B and C were in their best interest.

### C.   Customer D

104.   Defendant Graham recommended L Bonds to a retail customer who purchased $100,000 in 3-year L Bonds in or around January 2021 ("Customer D").

105.   Customer D was a 65-year-old retiree.  He had a moderate risk tolerance and his investment objectives did not include speculation.  Customer D's investor

profile indicated – paradoxically – that he had no general investment knowledge and limited knowledge of bonds.  Customer D had an annual income of $85,000, a net worth of $1,100,000, and a liquid net worth of $500,000.  The L Bonds constituted 9% of Customer D's net worth and 20% of his liquid net worth.

106.   Just three months prior to his investment in L Bonds, Customer D had reported a net worth of only $250,000.  It was only after Customer D expressed interest in purchasing a larger amount of L Bonds and being told by Graham he would need a higher net worth to do so, that Customer D told Graham he had $800,000 in gold.  Graham did not question the significant increase in Customer D's net worth and did nothing to confirm the existence of the additional assets.

107.   Customer D made his L Bond investment in his individual retirement account and planned to use the investment primarily for personal use.

108.   In the rationale included in the Client Disclosure Form for Customer D's L Bond purchase, defendant Graham wrote that Customer D was "seeking an additional income stream to supplement his retirement income" and that he wanted to "leverage a small portion of his IRA portfolio to accomplish this."

109.   However, the L Bonds were not a "small portion" of Customer D's IRA portfolio; the $100,000 in L Bonds Customer D purchased constituted 50% of his Western IRA, which was the only IRA portfolio defendant Graham was aware Customer D had.  Neither defendant Graham's supervisor, his supervisor's delegate, nor Western's compliance department identified the discrepancy.

110.   Defendant Graham's bases for believing that the $100,000 L Bond purchase was in Customer D's best interest were unreasonable.  They were vague, generic, and premised on an erroneous assumption.  Defendant Graham did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer D were in Customer D's best interest.

111.   Neither defendant Graham's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns regarding

1  Customer D's L Bond purchase.

2  **D.  Customer E**

3  112.  Defendant Gitipityapon recommended L Bonds to a retail customer who

4  purchased $30,000 in 2-year L Bonds in or around August 2020 ("Customer E").

5  113.  Customer E was a 54-year-old restaurant server.  Her risk tolerance was

6  moderate and her investment objectives did not include speculation.  She had an

7  annual income of $75,000, a net worth of $400,000 and a liquid net worth of

8  $150,000.  Her $30,000 L Bond investment represented 7.5% of her net worth and

9  20% of her liquid net worth.

10 114.  Customer E purchased the L Bonds in her individual account and

11 planned to use the interest accrued from them primarily for personal purposes.

12 115.  In the rationale section of the Client Disclosure Form, defendant

13 Gitipityapon wrote, in full:  "Client had a CD that came due and does not need the

14 funds for a few years.  She likes the interest rate of the bond and understands the risk

15 of the GWG bond.  This bond meets all of her need and objectives."

16 116.  Defendant Gitipityapon's bases for believing that the L Bond purchase

17 was in Customer E's best interest were unreasonable, vague, and generic.

18 Accordingly, defendant Gitipityapon did not exercise reasonable diligence, care, and

19 skill to have a reasonable basis to believe his recommendation of L Bonds to

20 Customer E were in Customer E's best interest.

21 117.  Neither defendant Gitipityapon's supervisor, the supervisor's delegate,

22 nor Western's compliance department raised any questions or concerns regarding

23 Customer E's L Bond purchase.

24 **E.  Customer F**

25 118.  Defendant Swan recommended L Bonds to a retail customer who

26 purchased $55,000 in seven-year L Bonds in or around August 2020 ("Customer F").

27 119.  Customer F was a 66-year-old retiree with an annual income of $30,000.

28 Customer F's investment objectives did not include speculation.  Customer F had a

liquid net worth of $550,000.  Her $55,000 L Bond investment represented approximately 5% of her net worth and 10% of her liquid net worth.

120.   Customer F purchased L Bonds directly, as an individual.

121.   Customer F had previously informed Swan that she did not want any capital risk to the money that provides the income portion of her retirement savings.

122.   Although Customer F's WIS Agreement lists her risk profile as moderate, in the Client Disclosure Form that accompanied Customer F's L Bond purchase, defendant Swan described her as "a conservative investor[.]"  Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department identified this discrepancy.

123.   During a previous review of her IRA investments with Defendant Swan, Customer F had told him she wanted to earn income safely without risking her principal.

124.   Defendant Swan's bases for believing that $55,000 L Bond purchase was in Customer F's best interest were unreasonable, vague, and unsupported. Accordingly, defendant Swan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer F were in Customer F's best interest.

125.   Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions of concerns regarding Customer F's L Bond purchase.

**F.   Customer G**

126.   Defendant Swan also recommended L Bonds to another retail customer who purchased $80,000 of 7-year L Bonds in or around August 2020 ("Customer G").

127.   Customer G was a 66-year-old retiree.  Her risk tolerance was moderate-conservative.  Customer G identified preservation of capital as one of her investment objectives, but not speculation.  Customer G had an annual income of $75,000, a net

worth of $1,500,000 and a liquid net worth of $900,000.  Customer G had limited general knowledge and limited knowledge of bonds.

128.   Customer G purchased the L Bonds in her individual account and planned to use the interest accrued from them primarily for personal purposes.

129.   Defendant Swan's bases for believing that an $80,000 L Bond purchase was in Customer G's best interest were unreasonable, vague, and unsupported. Accordingly, defendant Swan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer G were in Customer G's best interest.

130.   Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions of concerns regarding Customer G's L Bond purchase.

**G.    Customer H**

131.   Defendant Egan recommended L Bonds to a customer who invested $20,000 in 3-year L Bonds in or around August 2020 ("Customer H").

132.   Customer H was a 75 year-old retiree with a moderate conservative risk profile.  Customer H had an annual income of $50,000, a net worth of $250,000 and a liquid net worth of $250,000.  Customer H did not include speculation as an investment objective and had limited knowledge of investments in general and a limited knowledge of bonds.  Customer H's $20,000 L Bond purchase represented 8% of both his net worth and liquid net worth.

133.   Customer H purchased the L Bonds in his individual account and planned to use the interest accrued from them primarily for personal purposes.

134.   In the rationale section of the Client Disclosure Form for Customer H's L Bond investment, defendant Egan wrote, in full: "Client had extra cash in the bank and wanted to earn more interest than can be done in his bank. Client will also have a large cash balance in his bank account in addition to the $20,000 at GWG."

135.   Besides the rationale section of the Client Disclosure Form, defendant

Egan did not document anywhere his bases for believing that the $20,000 L Bond purchase was in Customer H's best interest.  Nowhere did defendant Egan document why he believed L Bonds specifically were in Customer H's best interest or why he chose to recommend L Bonds to Customer H as opposed to the many other investments that offered higher than interest rates than a bank account.

136.   Defendant Egan's bases for believing that the $20,000 L Bond purchase was in Customer H's best interest – including that they were lower risk than other alternative investments and that all of the life insurance policies held by GWG served as collateral for the L Bonds – were unreasonable and not supported by the facts disclosed in the 2020 Prospectus.  Accordingly, defendant Egan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer H were in Customer H's best interest.

137.   Neither defendant Egan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns regarding Customer H's L Bond purchase.

## VII.   Western's Policies and Procedures Were Insufficient.

138.   Reg BI's Compliance Obligation requires brokers or dealers to (a) establish, (b) maintain, and (c) enforce written policies and procedures reasonably designed to achieve compliance with Reg BI.

139.   Western maintains its policies and procedures in a document called "Written Supervisory Procedures" ("WSPs").  Western updated its WSPs on June 30, 2020 to include a section discussing the requirements of Reg BI.  After that, Western made no substantive changes to the Reg BI section of its WSPs during the time it was selling L Bonds.

140.   Western's parent, Atria, provided Western with draft policies and procedures regarding Reg BI, which Western incorporated into its June 30, 2020 WSPs.  Western's Reg BI policies and procedures are substantially copied from a

Small Entity Compliance Guide released to the public by the SEC in September of 2019. *See* https://www.sec.gov/info/smallbus/secg/regulation-best-interest. Accordingly, they contain general language and are not tailored to Western's business. They also do not include mechanisms for enforcing the policies and procedures.

141. For example, with respect to Reg BI's Care Obligation, the Western WSPs state registered representatives "should consider reasonably available alternatives offered by [Western] in determining whether there is a reasonable basis for making the recommendation." This language is taken almost verbatim from the SEC's Small Entity Compliance Guide. Western, however, provides no explanation of what may or may not constitute a reasonably available alternative and no procedures or guidelines for registered representatives or supervisors to follow in determining how to comply with the requirement.

142. As another example, Western's WSPs contain a subsection that instructs the registered representatives to take "particular care" in dispensing their Care Obligation with respect to complex or risky products, such as L Bonds. This section, too, is mostly taken from the SEC's Small Entity Compliance Guide. Again, Western does not elaborate or provide any specific guidance as to which investments are risky or how registered representatives should exercise this "particular care[.]"

143. Western's other policies and procedures – those not specifically addressing Reg BI – were also insufficient. For example, Western's WSPs state that each offering "will have specific suitability standards including information such as the purchaser's income and net worth," and instructs Western's registered representatives to ensure the purchaser meets those standards. However, Western's WSPs provide no guidance for offerings – such as L Bonds – where the issuer does not establish specific suitability standards.

144. As another example, the WSPs directed Western's compliance personnel to "follow up with the representative and supervisor regarding inconsistencies with

the account paperwork," but only "where total invested amounts exceed 10% of the client's net worth."

145.   Taken as a whole, Western's policies and procedures in effect during the time it was recommending L Bonds were not reasonably designed to achieve compliance with Reg BI's Care Obligation requirement that its registered representatives understand the potential risks, rewards, and costs associated with their recommendation of L Bonds.  These failures include, but are not limited to:

(a)   Although Western's policies and procedures required Western registered representatives to complete an online training prior to selling L Bonds, this policy either was not enforced or was enforced in such a way that it failed to ensure registered representatives adequately understood L Bonds. Despite the "significant reorientation" of GWG's business that was completed at the end of 2019, Western's registered representatives who took a training on a previous issuance of L Bonds, prior to that reorientation, were not required to take another training for the 2020 issuance.

(b)   Western's policies regarding its due diligence procedures for alternative investments required Western's CCO to review the Due Diligence report but did not require any other Western personnel, including supervisors and registered representatives, to receive or review the report.  The Due Diligence Report contained detailed analysis of the L Bonds and GWG and could have helped Western's supervisors and registered representatives understand the risks, rewards, and costs associated with L Bonds.

146.   In addition, Western's policies and procedures during the time it was recommending L Bonds were not adequately designed to achieve compliance with Reg BI's Care Obligation requirement that its registered representatives use reasonable diligence, care, and skill to form a reasonable basis to believe L Bonds were in the best interests of particular retail customers to whom they were recommended.  These failures include, but are not limited to:

(a)     As discussed above, although Western's policies and procedures require its registered representatives to consider reasonably available alternatives to investment recommendations, they provide no specific guidance for how to do so.

(b)     Although Western required registered representatives to provide an investment "rationale" on the Client Disclosure Forms, Western policies and procedures provide no guidance or instruction as to the purpose of the "rationale" section of the Client Disclosure Form or what information should be included.

(c)     Although the 2020 Prospectus explained that an investment in L Bonds was suitable only for persons with "substantial financial resources," Western neither provided guidance as to what constituted "substantial financial resources" for the purposes of an L Bond investment, nor did its WSPs set any limits on who could invest in L Bonds through Western.

147.     Because Western's policies and procedures were so vague, Western personnel had a limited ability to enforce those policies, as required by Reg BI's Compliance Obligation.  Western's deficiencies in this regard include, but are not limited to:

(a)     Due to Western's vague written policies, there was confusion as to who, at Western, was responsible for reviewing transactions for suitability and compliance with Reg BI's Care Obligation.

(b)     Western had no written policies or procedures guiding its supervisors' review as to whether a transaction was in a customer's best interest for the purpose of complying with Reg BI.

(c)     Western had no written policies or procedures guiding its compliance department's review of transactions under Reg BI.

(d)     Western had no written policies or procedures guiding its supervisors as to the purpose of the "rationale" in the Client Disclosure Forms,

what it was supposed to communicate, or how they were to review the rationales to enforce compliance with Reg BI.

(e)     Western had neither written policies nor procedures monitoring or enforcing its requirement that its registered representatives review reasonably available alternatives to a recommended security.

148.   In practice, Western and its agents repeatedly did not enforce what policies and procedures that Western did have to achieve compliance with Reg BI's Care Obligation.  For example:

(a)     The WSPs directed Western supervisors to identify "discrepanc[ies]" including when "the net worth amount is significantly increased," and to request a "sufficient explanation" for the discrepancy from the registered representative or "reach out to the customer for clarification." However, with respect to the discrepancies described in paragraphs 106, 109, and 122 above, those procedures were not followed.

(b)     Western's WSPs directed the compliance personnel responsible for conducting "surveillance" of alternative investments such as L Bonds to "review and consider" due diligence material, among other things.  However, Western's CCO never provided compliance personnel with the Due Diligence Report for L Bonds.

## FIRST CLAIM FOR RELIEF
### Violation of Reg BI's General Obligation
### [Rule 15*l*-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1)].
### (Against all Defendants)

149.   The SEC realleges and incorporates by reference paragraphs 1 through 148 above.

150.   By engaging in the conduct described above Western failed to act in the best interest of the retail customers by failing to establish, maintain, and enforce

written policies and procedures reasonably designed to achieve compliance with Regulation Best Interest.

151.   By engaging in the conduct described above, when making recommendations of securities transaction to retail customers, defendants Western, Cole, Egan, Gitipityapon, Graham, and Swan failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.

152.   Also, by engaging in the conduct described above, defendants Western Cole, Egan, Gitipityapon, Graham, and Swan made recommendations to retail customers without exercising reasonable diligence, care, and skill to have a reasonable basis to believe the recommendations were in the best interests of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

153.   The failure of Western to comply with Regulation Best Interest's Compliance Obligation, and the failures of Defendants Western, Cole, Egan, Gitipityapon, Graham, and Swan to comply with Regulation Best Interest's Care Obligation, constitute violations of Regulation Best Interest's General Obligation.

154.   By reason of the foregoing, Western, Cole, Egan, Gitipityapon, Graham, and Swan violated, and unless restrained and enjoined will continue to violate, Rule 15$l$-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1).

## **SECOND CLAIM FOR RELIEF**

**Control Person Liability Under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) for Defendants Cole, Egan, Gitipityapon, Graham, and Swan's Violations of Rule 15$l$-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1).**

### **(Against Western)**

155.   The SEC realleges and incorporates by reference paragraphs 1 through 148 above.

156.   By virtue of the foregoing, Defendants Cole, Egan, Gitipityapon, Graham, and Swan committed violations of Exchange Act Rule 15*l*-1(a)(1) by making recommendations to purchase L Bonds to retail customers while failing to exercise reasonable diligence, care, and skill to (a) understand the potential risks, rewards, and costs associated with the recommendation; and (b) form a reasonable basis to believe that the recommendation was in the best interest of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.

157.   Western exerted control over the activities of its registered representatives, including the specific activity upon which the Registered Representative Defendants' violations are based.

158.   By reason of the foregoing, Western is liable as a control person for Defendant Cole's, Egan's, Gitipityapon's, Graham's, and Swan's violations pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the violations alleged herein.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Western, Cole, Egan, Gitipityapon, Graham, and Swan, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Rule 15*l*-1(a)(1) of the Exchange Act, 17 CFR § 240.15l-1(a)(1).

**III.**

Order Defendants to pay disgorgement of any unjust enrichment they received as a result of the misconduct alleged, together with prejudgment interest thereon, under Sections 21(d)(5) and 21(d)(7) of the Exchange Act, 15 U.S.C. §§ 78u(d)(5), 78u(d)(7).

**IV.**

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

**JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.


Dated:  June 15, 2022


                                    */s/ Donald W. Searles*
                                    DONALD W. SEARLES
                                    Attorneys for Plaintiff
                                    United States Securities and Exchange Commission