**MORGAN, LEWIS & BOCKIUS LLP**
Joseph E. Floren, Bar No. 168292
joseph.floren@morganlewis.com
One Market Street
Spear Street Tower
San Francisco, CA  94105-1596
Telephone: (415) 442-1391
Fax: (213) 612-2501

**MORGAN, LEWIS & BOCKIUS LLP**
G. Jeffrey Boujoukos (*pro hac vice*)
jeff.boujoukos@morganlewis.com
1701 Market Street
Philadelphia, PA  19103-2921
Telephone: (215) 963-5000
Fax: (215) 963-5001

**MORGAN, LEWIS & BOCKIUS LLP**
Jason S. Pinney (*pro hac vice*)
jason.pinney@morganlewis.com
Andrew M. Buttaro (*pro hac vice*)
andrew.buttaro@morganlewis.com
One Federal Street
Boston, MA  02110-1726
Telephone: (617) 341-7700
Fax: (617) 341-7701

Attorneys for Defendant
WESTERN INTERNATIONAL
SECURITIES, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>WESTERN INTERNATIONAL SECURITIES, INC., NANCY COLE, PATRICK EGAN, ANDY GITIPITYAPON, STEVEN GRAHAM, and THOMAS SWAN,<br><br>Defendants. | Case No. 2:22-cv-04119-ODW-AFM<br><br>*Assigned to Hon. Otis D. Wright, II*<br><br>**DEFENDANT WESTERN INTERNATIONAL SECURITIES, INC.'S ANSWER TO COMPLAINT**<br><br>Complaint Served: June 15, 2022 |

Defendant Western International Securities, Inc. ("WIS"), by and through its undersigned counsel, hereby answers and asserts affirmative defenses to Plaintiff United States Securities and Exchange Commission's ("SEC") Complaint (ECF No. 1) ("Complaint"). Unless expressly admitted, all allegations set forth in the Complaint are denied.[1]

## PRELIMINARY STATEMENT

1. The Complaint accuses WIS of violating standards under Regulation Best Interest ("Reg BI" or the "Rule") that the SEC has never articulated. But WIS – like other broker-dealers regulated by the SEC – is entitled to know with ascertainable certainty what Reg BI requires. WIS cannot be forced to guess at what is required by Reg BI, and it cannot be held liable for failing to meet new standards of conduct that are first-announced by the SEC after the events in question in this first-ever action to enforce Reg BI.

2. As the Supreme Court rightly observed a decade ago, "[i]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding and demands deference." *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 158-59 (2012).

3. The SEC must provide fair notice of what Reg BI requires. It cannot hold WIS liable for violating requirements that do not appear anywhere in the Rule,

---

[1] WIS denies all titles, headings, footnotes, subheadings, and any other material not contained in numbered paragraphs unless otherwise noted. WIS also does not admit to the propriety of the various pseudonyms set forth in the Complaint. When a document (or statements, conclusions, or other material references therefrom) is referenced in the Complaint or this answer, it speaks for itself and WIS denies any allegations or characterizations based on the document. WIS reserves all rights with regard to the existence, authenticity, accuracy, and admissibility of such documents.

its 770-page adopting release, or published guidance. WIS, like other firms, has a Constitutional right to know what is required of it, so it can act accordingly.

**Regulation Best Interest**

4.     The SEC adopted Reg BI on June 5, 2019, after nearly a decade of intense public debate regarding the appropriate standard of conduct to govern the relationship between broker-dealers and their customers. *See* 17 C.F.R. § 240.15*l*-1 (2019) (codifying Reg BI). Reg BI generally requires broker-dealers to act in the "best interest" of retail customers when recommending a securities transaction, without placing the interest of the firm ahead of the interest of the customer. Reg BI applies only at the time that a recommendation is made. The Rule recognizes that a broker-dealer's relationship with a retail customer is transactional and episodic in nature. It does not impose obligations beyond a particular recommendation or require a broker-dealer to have a continuous duty to a retail customer.

5.     The SEC issued a 770-page adopting release regarding Reg BI. *See* Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34–86031 (June 5, 2019), 84 Fed. Reg. 33,318 (July 12, 2019) (File No. S7-07-18) ("Reg BI Adopting Release"), https://www.sec.gov/rules/final/2019/34-86031.pdf. The release discusses the requirements of Reg BI.

6.     The compliance date for Reg BI was set for June 30, 2020, more than a year after the final Rule was adopted, in order to provide an "opportunity for broker-dealers to comply with [Reg BI], including by creating or updating the necessary disclosures and developing, updating or establishing their policies and procedures and systems, as appropriate, to achieve compliance with [Reg BI]." *Id*. at 33,400.

**WIS's Implementation of Reg BI**

7.     As the compliance date for Reg BI approached, WIS engaged in reasonable, responsible, and good-faith efforts to comply with the Rule. For example, WIS: (i) obtained advice from third parties on Reg BI compliance; (ii)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

updated its policies and procedures to implement Reg BI; (iii) added a new policy specifically directed to Reg BI compliance; (iv) amended client forms for securities purchases to support compliance with Reg BI; (v) published new disclosures related to Reg BI; (vi) provided mandatory training to representatives and supervisors on Reg BI; (vii) discussed Reg BI compliance with supervisors during monthly meetings; and (viii) maintained an internal resource webpage for all representatives regarding Reg BI with procedures, forms, and FAQs.

8.     WIS also prepared a Client Relationship Summary ("Form CRS") to provide retail customers with information regarding WIS's services, fees and costs, and conflicts of interest.  The Form CRS contains disclosures required under Reg BI, and WIS adopted policies and procedures to ensure that its Form CRS is provided to customers as required when a recommendation is made.

9.     WIS also prepared additional customer disclosures related to Reg BI, including a Reg BI Relationship Guide and a Brokerage Services Disclosure Summary.

**The Recommendations Identified in the Complaint**

10.    The nine recommendations identified in the Complaint occurred between July and December 2020.

11.    WIS's policies and procedures required detailed paperwork to be completed in connection with each recommendation.  Each customer completed and signed: (i) a Client Agreement; (ii) a Client Disclosure Form for Alternative Products; and (iii) a Bond Purchase Form prepared by the issuer.  These forms were signed by the customer, one of the individual Defendants, and a registered principal for WIS.  WIS revised the content of its forms in June 2020 in response to Reg BI.

12.    By completing these forms, each customer acknowledged: (i) reading and understanding the offering materials for the securities, including the prospectus; (ii) understanding the risks of investing in the securities; (iii) fully discussing the

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

merits, risks, and material facts of the purchase with the representative; and (iv) determining that the securities were suitable and consistent with the customer's overall investment objectives.

13. In addition, a Client Relationship Acknowledgment Form was completed for each recommendation described in the Complaint memorializing that Form CRS and related disclosures have been provided to the clients.

**Statements on Reg BI Compliance**

14. Given the scope and complexity of Reg BI's requirements, SEC leadership stated that the agency would initially examine firms to see if they had made good-faith efforts to comply with the new Rule. For example, on April 2, 2020, former SEC Chairperson Jay Clayton stated that "[d]uring the initial period following the compliance date, SEC examiners will be focusing on whether firms have made a good faith effort to implement policies and procedures necessary to comply with Reg BI, while also providing an opportunity to work with firms on compliance and other questions." The following week, the former Director of the SEC's Office of Compliance Inspections and Examinations (now the Division of Examinations) reiterated Chairperson Clayton's comments and acknowledged that implementing Reg BI would be an "iterative process" and that the agency's "focus will be on firms continuing good faith and reasonable efforts, including taking into account firm-specific effects from disruptions caused by COVID-19."

15. The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization that, under the Securities Exchange Act of 1934, is the regulator primarily responsible for the regulation and examination of broker-dealers. FINRA operates under the supervision of the SEC.

16. In public statements FINRA has asserted that it has been "coordinating very closely with the SEC to avoid regulatory overlap and to ensure consistency of approach," and that it "confer[s] regularly with [the SEC] on interpretive questions."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

17. Like the SEC, FINRA announced that it would be examining broker-dealers for compliance with Reg BI.

### FINRA Examination of WIS for Reg BI Compliance

18. FINRA initiated a thorough examination of WIS on or about June 12, 2020. FINRA's examination included reviewing WIS's compliance with Reg BI. FINRA requested and received: (i) information on new accounts opened after the Reg BI compliance date; (ii) copies of updated Reg BI policies and procedures, including the policies and procedures at issue in the Complaint; (iii) copies of Reg BI training materials, including the training materials provided to the individual Defendants; and (iv) copies of updated transaction-related documentation for alternative products, including the types of documents completed for the securities at issue in the Complaint.

19. On February 12, 2021, FINRA sent a letter to WIS stating that it had completed its examination. The letter included a fifteen-page Report on the Examination of WIS ("Exam Report"). As reflected in the Exam Report, FINRA identified two exceptions specific to Reg BI: one relating to the Rule's "Compliance Obligation," and the other related to the Rule's "Disclosure Obligation."

20. With respect to the Compliance Obligation exception, FINRA's Exam Report noted that WIS's policies did not detail the steps and reviews to be undertaken by supervisors to ensure compliance with Reg BI, including the frequency and documentation of reviews. The Disclosure Obligation exception related to the use of the word "advisor" and/or "adviser" on business cards used by three representatives of the firm.

21. WIS promptly addressed the deficiencies identified in the Exam Report, consistent with its continued good-faith efforts to comply with Reg BI. On March 3, 2021, WIS sent a letter to FINRA explaining that WIS had updated its policies and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

procedures in response to the two Reg BI exceptions identified in the Exam Report and provided FINRA with an updated copy of its policies and procedures.

22. The deficiencies alleged in the Complaint are nothing like the two exceptions that FINRA identified in its Exam Report. For example, the Exam Report does not suggest that WIS's policies and procedures did not offer representatives specific guidance tailored to the firm's operations or that WIS had inadequate enforcement procedures.

**The GWG Investigation**

23. On information and belief, the SEC has been investigating GWG Holdings, Inc. ("GWG") for approximately two years. GWG's Chief Financial Officer recently disclosed that the Enforcement Division of the SEC served a subpoena on GWG in October 2020 concerning GWG's "issuance of Bonds" and "certain accounting matters."

24. On July 9, 2021, the SEC issued a document subpoena to WIS (the "Subpoena") in connection with an SEC investigation captioned *In the Matter of GWG Holdings, Inc.* (C-08693). The Subpoena sought documents from WIS related to the sale of bonds issued by GWG.

25. At the time, GWG was a public company. Its shares traded on the Nasdaq stock exchange under the ticker "GWGH."

26. The Subpoena requested information regarding the sale of corporate bonds offered by GWG. The bonds were known as "L Bonds." Extensive information regarding GWG's L Bond offerings is disclosed in prospectuses and registration statements that GWG filed with the SEC.

27. L Bonds were sold to the public through a selling group of broker-dealers, including WIS. On information and belief, there were approximately 145 broker-dealers engaged to sell L Bonds. Through September 2021, the total amount of L Bonds sold to customers is reported to be approximately $2.3 billion.

**The Complaint**

28. The SEC filed its Complaint against WIS on June 15, 2022, approximately two-weeks shy of the two-year anniversary of the Reg BI compliance date.

29. The Complaint is the first action brought by the SEC to enforce Reg BI. There are no prior SEC enforcement matters to consider in determining what Reg BI requires or how it should be enforced.

**SEC Congressional Testimony Regarding Reg BI**

30. Just over a month after the Complaint was filed, the Director of the SEC Division of Enforcement testified before a U.S. House subcommittee in a hearing entitled "Oversight of the SEC's Division of Enforcement."  This case was discussed at the hearing.  During his testimony the Director was asked if Reg BI is causing broker-dealers to change their practices.  The Director, after acknowledging that this litigation is the SEC's "first Reg BI action," testified that he hopes that enforcement actions will allow Reg BI to "hav[e] its desired effect in the market."

**WIS Was Not Provided Fair Notice**

31. In its Complaint the SEC repeatedly accuses WIS of violating standards that are not articulated anywhere in Reg BI or related guidance.  For example, the SEC repeatedly criticizes WIS for not providing its internal due diligence report regarding L Bonds to WIS registered representatives and supervisors.  *See* Compl. ¶¶ 56, 73, 145(b), 148(b).  But there is nothing in Reg BI or related SEC guidance that requires firms to do this.  Similarly, Reg BI does not specifically require firms to: (i) provide supplemental training to representatives on new bond issuances when there are significant changes in an issuer's business (*see id*. ¶¶ 58, 72, 145(a)); (ii) establish criteria or thresholds for customers to invest in securities (*see id*. ¶ 57); or (iii) verify financial information provided by customers related to securities purchases (*see id*. ¶ 106).

32. The SEC cannot hold WIS liable for failing to satisfy Reg BI requirements that the SEC has never articulated. That would deprive WIS of its right to "fair notice" of what the Rule requires. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.").

33. The fair notice standard provides that a person of ordinary intelligence must have a reasonable opportunity to know what is prohibited or required. Furthermore, as a regulated entity, WIS is entitled to know with ascertainable certainty what Reg BI prohibits or requires.

34. After examining WIS's policies and procedures for Reg BI compliance, FINRA did not identify the myriad of alleged Reg BI violations asserted by the SEC in the Complaint. Because FINRA did not identify any of these alleged compliance failures in its examination, it is not reasonable to expect WIS to have understood that the SEC would find its policies and procedures were not in compliance with the Rule.

35. The Complaint also faults WIS for incorporating into its policies and procedures guidance from a Small Entity Compliance Guide published by the SEC. Compl. ¶¶ 140-42. The guide was prepared by SEC staff to "summarize[] and explain[]" Reg BI. WIS could not have reasonably understood that updating its policies and procedures to reflect Reg BI guidance from the SEC was prohibited.

36. The Complaint also accuses WIS of failing to engage in practices that the SEC has previously said are *not* required by Reg BI. For example, the SEC criticizes WIS representatives for failing to document why recommendations to purchase L Bonds were in a customer's best interest or better than other reasonably available alternative investments. Compl. ¶¶ 97, 135. But SEC guidance explicitly states that firms are not required to document the basis for their recommendations or their analysis of reasonably available alternatives. *See*, *e.g.*, Reg BI Adopting

Release at 33,382 ("[B]roker-dealers or their associated persons are not required to prepare and maintain documentation regarding the basis for each specific recommendation, including an evaluation of a recommended securities transaction or investment strategy against similar available alternatives.").

37. The Complaint also alleges that WIS's compliance department did not examine whether the purchases at issue were in customers' best interest. Compl. ¶ 64. But SEC guidance plainly says that a transaction-by-transaction compliance review of Reg BI recommendations is not required. *See* Reg BI Adopting Release at 33,385 (indicating Reg BI does not require firms to establish compliance systems that involve "a detailed review of each recommendation").

38. Furthermore, the Complaint critiques WIS for not offering representatives "specific guidance" regarding: (i) taking "particular care" when recommending complex investments; (ii) the "rationale" section in the Client Disclosure Form; and (iii) the meaning of "substantial financial resources" as that term is used in the GWG prospectus for the L Bonds. Compl. ¶¶ 13, 142, 146(a)-(c). But the SEC has stated that Reg BI does not prescribe how firms must comply with the Compliance Obligation or mandate specific requirements. *See* Reg BI Adopting Release at 33,397 ("[T]he Commission is not mandating specific requirements pursuant to the Compliance Obligation."). Moreover, the term "particular care" is included in the SEC Small Entity Compliance Guide, and it is not defined.

39. The SEC is not entitled to enforce Reg BI in a manner that conflicts with prior agency interpretations of the Rule.

40. This is a high-impact case. It is the SEC's first action to enforce a controversial new rule that was adopted after nearly ten years of heated public debate. SEC leadership has commented on the importance of high-impact cases, stating that they "change behavior" and "send a message to the rest of the market." But "regulation by enforcement" in this context is regulatory overreach. It deprives

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

regulated entities of their due process right to understand what is expected of them. When that happens courts must intervene.

## RESPONSES TO PLAINTIFF'S ALLEGATIONS

## JURISDICTION AND AUTHORITY

1.     *The SEC brings this action pursuant to authority conferred on it by Sections 21(d) and (e) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin the defendants Western International Securities, Inc. ("Western"), Nancy Cole, Patrick Egan, Andy Gitipityapon, Steven Graham, and Thomas Swan (together, "Defendants") from engaging in the acts, practices, and courses of business described in this Complaint and acts, practices, and courses of business of similar purport and object.*

RESPONSE: The allegations contained in paragraph 1 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS denies that it has engaged in any violation of law or that any injunction is warranted.

2.     *The Court has jurisdiction over this action pursuant to Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e).*

RESPONSE: The allegations contained in paragraph 2 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS admits that this Court has jurisdiction over this matter.

3.     *Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.*

RESPONSE: The allegations contained in paragraph 3 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS admits that venue is proper in this district.

4.     *Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

RESPONSE: The allegations contained in paragraph 4 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS admits that it has engaged in interstate commerce.

5.    *There is a reasonable likelihood that Defendants will, unless enjoined, continue to engage in the transactions, acts, practices and courses of business set forth in this complaint, and transactions, acts, practices and courses of business of similar purport and object.*

RESPONSE: The allegations contained in paragraph 5 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS denies the allegations and states that it has followed the requisite requirements under Reg BI in connection with recommendations to retail customers and that the relief sought in the Complaint should be denied in full.

## SUMMARY

6.    *This matter concerns violations by Western and five of its registered representatives of the Best Interest Obligation under Rule 15l-1(a) of the Securities Exchange Act of 1934 ("Regulation Best Interest" or "Reg BI") in connection with their recommendations to retail customers to purchase an unrated debt security known as an L Bond.*

RESPONSE: The allegations contained in paragraph 6 constitute legal conclusions to which no response is required.  To the extent any response is necessary, WIS denies the allegations and states that it has followed the requisite requirements under Reg BI in connection with recommendations to retail customers.

7.    *L Bonds were corporate bonds offered by GWG Holdings, Inc. ("GWG"). L Bonds were high risk, illiquid, and only suitable for customers with substantial financial resources. The L Bonds relevant to this Complaint paid fixed interest rates of between 5.50% and 8.50%, depending on the maturity period of the bond. GWG offered maturity periods of two, three, five, or seven years.*

RESPONSE: WIS admits that L Bonds were corporate bonds offered by GWG.  WIS further states that the prospectus for GWG L Bonds dated June 3, 2020 and filed with the SEC (the "Prospectus") describes the nature of that L Bond offering and speaks

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

for itself. The Prospectus is publicly available at https://www.sec.gov/Archives/edgar/data/1522690/000121390020014212/ea122727-424b1_gwgholdings.htm. WIS denies any characterization of L Bonds in paragraph 7 that is inconsistent with the Prospectus.

8. *Between July of 2020 and April of 2021, registered representatives of Western recommended and sold approximately $13.3 million in L Bonds to retail customers.*

RESPONSE: The allegations in paragraph 8 state a sales figure based on unspecified data. Accordingly, WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 8 and, on that basis, denies them, except that WIS admits that its representatives recommended L Bonds to certain retail customers between July 2020 and April 2021. Responding further, the total amount of L Bond purchases in connection with the nine recommendations identified in the Complaint is approximately $635,000.

9. *These recommendations violated Regulation Best Interest in several ways. Regulation Best Interest requires that a broker, dealer, or associated person act in the best interest of a retail customer when making a recommendation of a securities transaction ("Reg BI's Best Interest Obligation"). Firms comply with Reg BI's Best Interest Obligation only if they comply with four component obligations ("Reg BI's Component Obligations"): the Disclosure Obligation, the Care Obligation, Conflict of Interest Obligation, and the Compliance Obligation. Similarly, associated persons of broker-dealers comply with Reg BI's Best Interest Obligation only if they comply with the Disclosure Obligation and the Care Obligation.*

RESPONSE: WIS denies the allegations in the first sentence of paragraph 9. The remaining allegations in paragraph 9 are legal conclusions to which no response is required. To the extent paragraph 9 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

10. *Reg BI's Care Obligation requires a broker, dealer, or associated person of a broker or dealer, in making a recommendation of a securities transaction, to*

*exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.*

RESPONSE: The allegations contained in paragraph 10 are legal conclusions to which no response is required. To the extent paragraph 10 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

11. *Western and its registered representatives Nancy Cole, Patrick Egan, Andy Gitipityapon, Steven Graham, and Thomas Swan (together, the "Registered Representative Defendants") failed to comply with this aspect of their Care Obligation, because they failed to exercise reasonable diligence, care, and skill to understand the risks, rewards, and costs associated with L Bonds. At the time they recommended L Bonds to retail customers, the Registered Representative Defendants did not understand key risks associated with L Bonds and GWG.*

RESPONSE: WIS denies the first sentence of paragraph 11. The second sentence of paragraph 11 seeks to characterize the state of mind of the individual Defendants and is not directed at WIS, and the allegations are denied on that basis.

12. *Reg BI's Care Obligation also requires a broker, dealer, or associated person, in recommending a securities transaction to a retail customer, to exercise reasonable diligence, care, and skill to have a reasonable basis to believe the recommendation is in the best interests of that customer, based on the customer's investment profile and the potential risks, rewards, and costs associated with the recommendation. Defendants failed to comply with this component of the Care Obligation as well, by recommending L Bonds to at least seven retail customers without a reasonable basis to believe L Bonds were in those customers' best interests. Among other things, these customers had moderate-conservative or moderate risk tolerances, investment objectives that did not include speculation, limited investment experience, limited liquid net worth, and/or they were retired. The Registered Representative Defendants nevertheless recommended L Bonds to these seven customers without reasonable bases for doing so.*

RESPONSE: The allegations in the first sentence of paragraph 12 constitute legal conclusions to which no response is required. To the extent this sentence purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

allegations that are inconsistent with the Rule. WIS denies the second and fourth sentences of paragraph 12. WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the third sentence of paragraph 12 and, on that basis, denies them, except that WIS admits that these customers provided information regarding their risk tolerance, investment objectives, investment experience, net worth, and employment status to WIS on account forms and those documents speak for themselves.

13.     *Reg BI's Compliance Obligation, another Component Obligation of the Best Interest Obligation, requires brokers or dealers to (a) establish, (b) maintain, and (c) enforce written policies and procedures reasonably designed to achieve compliance with Reg BI. Western failed to comply with its Compliance Obligation. Its written policies and procedures were not reasonably designed to achieve compliance with Reg BI's Care Obligation. Western's written policies and procedures merely recited the objectives of Reg BI, without offering registered representatives specific guidance tailored to Western's operations. Western also had inadequate procedures for enforcing what limited policies it had regarding compliance with the Care Obligation of Reg BI.*

RESPONSE: The allegations in the first sentence of paragraph 13 constitute legal conclusions to which no response is required. To the extent this sentence purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule. WIS denies the remaining allegations in paragraph 13.

14.     *The SEC brings this civil enforcement action seeking permanent injunctions, disgorgement and prejudgment interest, and civil penalties against Western and the Registered Representative Defendants, based on their violations of Rules 15l-1(a)(1) of the Exchange Act, and, in the alternative, against Western as a control person pursuant to Section 20(a) of the Exchange Act.*

RESPONSE: WIS admits only that the SEC seeks the relief listed in paragraph 14. The allegations in paragraph 14 describe Plaintiff's prayer for relief as to which no response is required. To the extent any response is necessary, WIS denies that it has

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

15

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

engaged in any violation of law and denies that Plaintiff is entitled to any relief whatsoever.

## DEFENDANTS

15. **Western International Securities, Inc. ("Western")** *is a California corporation with is headquarters in Pasadena, California. It is registered with the Commission as an investment adviser and a broker-dealer. Through its registered representatives and advisors, Western sells various securities to retail customers, including alternative investments, such as L Bonds. As of May 2020, Western is owned by Atria Wealth Solutions, Inc. ("Atria"), a wealth management solutions holding company.*

RESPONSE: WIS admits the allegations in paragraph 15. Responding further, WIS is also a member of FINRA and the Securities Investor Protection Corporation.

16. **Nancy Cole**, *age 74, is a resident of Sacramento, California. Cole has worked as an independent contractor for Western as a registered representative since August 2008.*

RESPONSE: WIS admits the allegations in paragraph 16.

17. **Patrick Egan**, *age 56, is a resident of Alhambra, California. Egan has worked as an independent contractor for Western as a registered representative since 1998.*

RESPONSE: WIS admits the allegations in paragraph 17, except to clarify that Defendant Egan was initially an employee of WIS.

18. **Andy Gitipityapon**, *age 46, is a resident of Sherman Oaks, California. Gitipityapon, has worked as an independent contractor for Western office as a registered representative since April 2018.*

RESPONSE: WIS admits the allegations in paragraph 18.

19. **Steven Graham**, *age 61, is a resident of Santa Clarita, California. Graham has worked as an independent contractor for Western as a registered representative since September 2020.*

RESPONSE: WIS admits the allegations in paragraph 19.

20. **Thomas Swan**, *age 62, is a resident of Acme, Washington. Swan has worked as an independent contractor for Western as a registered representative since May 2008.*

RESPONSE: WIS admits the allegations in paragraph 20.

## RELATED ENTITIES

21. **GWG Holdings, Inc.** *("GWG") is a publicly traded company (NASDAQ: GWGH) that has its principal executive offices in Dallas, Texas. Prior to 2018, GWG, through its various subsidiaries, acquired life insurance policies on the secondary market. Following a series of transactions with Beneficient Company Group, L.P. in 2018 and 2019, GWG's business changed to focus on providing liquidity to holders of illiquid investments and alternative assets.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 21 and, on that basis, denies them, except that WIS admits that information contained in paragraph 21 is generally reflected in the Prospectus, which speaks for itself. WIS denies any allegations that are inconsistent with the Prospectus.

22. **Beneficient Company Group, L.P.** *("Beneficient"), is a Dallas, Texas based company. Although Beneficient was formed in 2003, it has only been operating its current business model – providing liquidity to owners of alternative assets and illiquid investments - since September 2017. Following a series of transactions in 2018 and 2019, Beneficient's management gained control over GWG, and Beneficient became a wholly-owned subsidiary of GWG.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 22 and, on that basis, denies them, except that WIS admits that information contained in paragraph 22 is generally reflected in the Prospectus, which speaks for itself. WIS denies any allegations that are inconsistent with the Prospectus.

## FACTS

I.   **GWG L Bonds Are A High Risk, Illiquid Investment.**

23. *GWG is a financial services company. Prior to 2018, GWG's business model involved acquiring, through its various subsidiaries, life insurance policies in the secondary market. That is to say, GWG purchased life insurance policies from consumers who owned life insurance they no longer wanted or needed. GWG purchased the policies then continued to pay the premiums and collected the policy benefits upon the insured's death.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

RESPONSE: WIS admits that GWG is a financial services company.  WIS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 23 and, on that basis, denies them, except that WIS admits that some of the information contained in paragraph 23 is generally reflected in the Prospectus, which speaks for itself.  WIS denies any allegations that are inconsistent with the Prospectus.  Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint.  WIS will seek information from the SEC on its investigation of GWG in discovery.

24.     *In 2018 and 2019, GWG consummated a series of transactions with Beneficient that resulted in a significant reorientation of its business. Beneficient's management gained control over GWG, Beneficient became a wholly-owned subsidiary of GWG, and GWG's business model changed. Specifically, GWG stopped acquiring life insurance policies and focused instead on Beneficient's still-developing business model.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 24 and, on that basis, denies them, except that WIS admits that some of the information contained in paragraph 24 is generally reflected in the Prospectus, which speaks for itself.  WIS denies any allegations that are inconsistent with the Prospectus.  Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

25.     *Beneficient was formed in 2003 but began its current business model in September 2017. Since then, Beneficient has been in the business of offering, through its subsidiaries, loans, other liquidity products, and related services to customers holding illiquid alternative assets. In other words, it extends loans collateralized by cash flows from illiquid alternative assets, and provides services to trustees who administer the collateral.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 25 and, on that basis, denies them, except that WIS admits that some of the information contained in paragraph 25 is generally reflected in the Prospectus, which speaks for itself.  WIS denies any allegations that

are inconsistent with the Prospectus. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

26. *Since 2012, GWG has raised funds for its operations by selling corporate bonds — initially called Renewable Secured Debentures, but since 2015 known as L Bonds — to retail customers through a network of broker-dealers.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 26 and, on that basis, denies them, except that WIS admits that GWG publishes financial information in certain regulatory filings, which speak for themselves. WIS denies the allegations in paragraph 26 to the extent they are inconsistent with GWG's regulatory filings. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

27. *A corporate bond is a debt obligation, like an "IOU." Customers who buy corporate bonds are lending money to the company issuing the bond. In return, the company promises to pay interest on the principal and to return the principal when the bond comes due, or "matures."*

RESPONSE: The allegations in paragraph 27 consist of characterizations and general descriptions to which no response is required. To the extent any response is necessary, WIS denies the allegations, except admits that a corporate bond is a type of debt instrument.

28. *Since 2012, GWG has offered L Bonds in four separate offerings: (1) an offering of up to $250 million in L Bonds beginning January 2012, (2) an offering of up to $1 billion in L Bonds beginning in January 2015, (3) an offering of up to $1 billion in L Bonds beginning in December 2017, and (4) an offering of up to $2 billion in L Bonds beginning in June 2020. The L Bonds relevant to this Complaint are from the fourth offering.*

RESPONSE: Regarding the first sentence of paragraph 28, WIS admits that GWG has offered L Bonds in four separate offerings, as described in various prospectuses filed with the SEC, and those documents speak for themselves. WIS denies the

allegations to the extent they are inconsistent with the prospectuses.  Regarding the second sentence of paragraph 28, WIS admits that the L Bond sales described in the Complaint relate to the offering described in the Prospectus, but otherwise denies the allegations.  Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint.  WIS will seek information from the SEC on its investigation of GWG in discovery.

29. *L Bonds sold in the fourth offering had terms of two, three, five, and seven years, and they paid fixed interest rates of between 5.50% and 8.50%, depending on the maturity. The minimum investment was $25,000.*

RESPONSE: WIS admits the allegations in paragraph 29, as described in the Prospectus, and denies the allegations to the extent they are inconsistent with the Prospectus.

30. *GWG has sold nearly $2.0 billion in L Bonds since it began selling them in 2012. GWG sold approximately $453 million in L Bonds in the fourth offering. As of September 30, 2021 (the most recent data GWG made available) GWG had $1.3 billion in L Bonds outstanding.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 30 and, on that basis, denies them, except that WIS admits that GWG publishes financial information in certain regulatory filings, which speak for themselves.  WIS denies the allegations in paragraph 30 to the extent they are inconsistent with GWG's regulatory filings.  Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint.  WIS will seek information from the SEC on its investigation of GWG in discovery.

31. *The offering document GWG used for the fourth bond offering (the "2020 Prospectus") was 40 pages long and contained information about GWG and L Bonds.*

RESPONSE: WIS admits the allegations in paragraph 31.

32. *The 2020 Prospectus expressly incorporated by reference certain documents, including GWG's Form 10-K for the year ended December 31, 2019 and GWG's Form 10-Q for the quarter ended March 31, 2020.*

RESPONSE: WIS admits the allegations in paragraph 32.  Responding further, WIS states that the Prospectus also incorporated by reference other documents, including GWG's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020; Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC on May 15, 2020; and Current Reports on Form 8-K filed with the SEC on January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020 and March 20, 2020.

33.   *The 2020 Prospectus disclosed several risks associated with L Bonds. Among other things, investing in L Bonds involves a "high degree of risk, including the risk of losing [one's] entire investment[,]" and "[i]nvesting in L Bonds may be considered speculative."*

RESPONSE: WIS admits that the Prospectus contained risk disclosures, which speak for themselves.  WIS denies any characterizations in paragraph 33 to the extent they are inconsistent with the Prospectus.

34.   *In addition, L Bonds are an illiquid investment. No market for L Bonds exists, and no such market is expected to develop. If a market for L Bonds does not develop, customers may not be able to sell their L Bonds for the price they paid or at all. As such, as GWG disclosed on the second page of the 2020 Prospectus, "L Bonds are only suitable for persons with substantial financial resources and with no need for liquidity in this investment." (emphasis in original.)*

RESPONSE: WIS admits the allegations in paragraph 34, except that WIS denies any characterizations to the extent they are inconsistent with the Prospectus. Responding further, WIS states that the Prospectus provides for call and redemption prior to stated maturity under certain conditions.

35.   *Unlike many corporate bonds, L Bonds are not rated by any bond rating agency. Bond rating agencies assign letter grades (e.g., AAA, B, C) to bonds based on their evaluation of the credit risk associated with the bonds' issuer. No independent rating agency has rated L Bonds.*

RESPONSE: WIS admits that L Bonds are not rated by any independent bond rating agency, but otherwise denies the allegations in the first and third sentences.  WIS

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

21

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

states that the second sentence of paragraph 35 consists of generalizations and characterizations to which no response is required. To the extent any response is necessary, WIS denies the allegations.

36. *GWG has a history of net losses and has not generated sufficient operating and investing cash flows to fund its operations. For the year ended December 31, 2019, GWG posted a net loss from operations of $79.6 million and negative operating cash flow of $142.8 million. GWG depends on financing — primarily debt financing, such as L Bonds — to fund its operations.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 36 and, on that basis, denies them, except that WIS admits that GWG publishes financial information in certain regulatory filings, which speak for themselves. WIS denies the allegations in paragraph 36 to the extent they are inconsistent with GWG's regulatory filings. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

37. *Beneficient has a limited operating history and generated net losses from operations of $166 million and $167 million for the years ending December 31, 2018 and December 31, 2019, respectively.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 37 and, on that basis, denies them, except that WIS admits that GWG publishes financial information in certain regulatory filings, which speak for themselves. WIS denies the allegations in paragraph 37 to the extent they are inconsistent with GWG's regulatory filings. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

38. *GWG's largest asset as of December 31, 2019, was Beneficient's goodwill ($2.4 billion), which constituted 65% of GWG's consolidated assets at that time. Goodwill is an intangible asset that arises when a buyer acquires an*

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

22

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

*existing business, representing the excess consideration paid by the buyer for the business over the acquired business' identifiable net assets. Beneficient recorded this goodwill when GWG obtained control of it on December 31, 2019. Eliminating goodwill, which is an intangible asset that cannot be used to pay down debt, GWG's liabilities are well in excess of its assets.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first and third sentences of paragraph 38 and, on that basis, denies them, except that WIS admits that GWG publishes financial information in certain regulatory filings, which speak for themselves. WIS denies the allegations in paragraph 38 to the extent they are inconsistent with GWG's regulatory filings. WIS states that the second and fourth sentences of paragraph 38 consist of generalizations and characterizations to which no response is required. To the extent any response is necessary, WIS denies the allegations. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

39. *GWG's largest tangible asset is its portfolio of life insurance policies, which had a face value of approximately $2 billion and fair value of $796 million as of December 31, 2019. However, L Bonds are not directly secured by GWG's life insurance portfolio. Instead, L Bonds are primarily secured by GWG's equity ownership interests in certain GWG subsidiaries. The claims of L Bond holders to assets, such as GWG's portfolio of life insurance policies, are subordinate to the interests of creditors of those entities. L Bond holders' claims to GWG's life insurance assets are subordinate to a senior credit facility, which holds a direct security interest in GWG's life insurance portfolio. The fair value of GWG's life insurance portfolio, less the amounts owed on the senior credit facility, is insufficient to repay GWG's outstanding L Bond debt.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 39 and, on that basis, denies them, except that WIS admits that GWG publishes financial and security information in certain regulatory filings, which speak for themselves. WIS denies the allegations in

paragraph 39 to the extent they are inconsistent with GWG's regulatory filings. WIS also states that paragraph 39 consists of characterizations to which no response is required. To the extent any response is necessary, WIS denies the allegations. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

**II.      GWG Suspended Sales of L Bonds.**

40.      *GWG temporarily ceased its sale of L Bonds in April of 2021 because it was unable to file its 2020 Form 10-K. GWG subsequently filed its Form 10-K for the year ended December 31, 2020 on November 5, 2021 and resumed selling L Bonds.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 40 and, on that basis, denies them, except that WIS admits that GWG publishes information relating to L Bond sales in certain regulatory filings, which speak for themselves, and WIS admits that GWG filed a Form 10-K for the year ended December 31, 2020 on November 5, 2021. WIS denies the allegations in paragraph 40 to the extent they are inconsistent with GWG's regulatory filings. By way of further answer, the Chief Financial Officer for GWG in a publicly filed Declaration under the penalty of perjury stated that a consultation with the SEC's Office of Chief Accountant in 2021 resulted in the delayed filing of certain financial statements and a voluntary suspension of bond sales. Responding further, upon information and belief, the SEC was investigating GWG prior to the sales at issue in the Complaint. WIS will seek information from the SEC on its investigation of GWG in discovery.

41.      *On January 15, 2022, GWG filed a Form 8-K disclosing that following its resumption of L Bond sales, GWG had "experienced significantly lower L Bond sales than it had experienced previously" and that it "did not make the January 15, 2022 interest payment of approximately $10.35 million and principal payments of approximately $3.25 million with respect to its L*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

24

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

*Bonds....” In that same filing, GWG stated it had suspended further sales of L Bonds as of January 10, 2022.*

RESPONSE: WIS admits the allegations in paragraph 41, except that the SEC's EDGAR portal identifies the filing date for GWG's Form 8-K as January 18, 2022. Responding further, the Chief Financial Officer for GWG in a publicly filed Declaration under the penalty of perjury stated: "[a]s soon as GWGH indicated its intent to restart its Bond sales, the SEC as part of its investigation of the Bond sales practices of its selling group members issued subpoenas and document requests to individual Broker Firms that were selling or were considering selling GWGH Bonds."   The Declaration further stated, "[f]ollowing that, Bond sales from December 2021 to January 10, 2022 were dramatically lower than anticipated and insufficient to cover an interest payment of approximately $10.35 million and principal payments of approximately $3.25 million due on January 15, 2022."

42.    *On April 20, 2022, GWG filed for Chapter 11 bankruptcy. In re: Holdings, Inc., et al., Case No. 22-90032 (Bankr. S.D. Tex.).*

RESPONSE: WIS admits the allegations in paragraph 42.  Responding further, the Chief Financial Officer for GWG in a publicly filed Declaration under the penalty of perjury stated that "the SEC's investigation, particularly its focus on how the Bonds were sold by selling group firms, has had the effect of significantly impacting the Company's ability to access the capital markets."  The Declaration further stated, "[a]s noted, in connection with the SEC's investigation, the SEC has issued subpoenas and document requests to many of GWGH's Broker Firms, in some instances issuing information requests on an ongoing, or even daily, individual transaction-level basis."  It added, "[a]s a result, a number of Broker Firms indicated that they would not resume sale of the Bonds until further notice due to concerns of getting involved further in the SEC's investigation," and "[w]ithout access to the capital markets, particularly through Bond issuance, the Debtors have been cut off from a key source of liquidity that it has historically used to fund its operations."

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

25

WESTERN INTERNATIONAL SECURITIES INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

**III.    Requirements of and Commission Guidance Regarding Reg BI.**

43.    *Reg BI, which became effective on June 30, 2020, established a standard of conduct for broker-dealers and associated persons when they recommend securities transactions to retail customers.*

RESPONSE: WIS denies that Reg BI became effective on June 30, 2020.  The remaining allegations contained in paragraph 43 constitute legal conclusions to which no response is required.  To the extent paragraph 43 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations in paragraph 43 that are inconsistent with the Rule.  Responding further, WIS states that the compliance date for Reg BI was June 30, 2020.

44.    *The SEC issued a 175-page adopting release, offering guidance on how the Commission interprets Reg BI. See Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34-86031, 84 Fed. Reg. 33318 (July 12, 2019) (the "Adopting Release").*

RESPONSE: WIS admits the allegations in paragraph 44, except that the Reg BI Adopting Release published by the SEC on its website is 770 pages long.

45.    *Reg BI's Best Interest Obligation requires a broker, dealer, or a natural person associated with a broker or dealer, when making a recommendation of any securities transaction to a retail customer, to act in the best interest of that retail customer at the time the recommendation is made, without placing the financial or other interest of the broker, dealer, or associated person ahead of the interest of the retail customer.*

RESPONSE: The allegations contained in paragraph 45 constitute legal conclusions to which no response is required.  To the extent paragraph 45 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

46.    *The Best Interest Obligation is satisfied only by compliance with four Component Obligations: (1) Disclosure Obligation, (2) Care Obligation, (3) Conflict of Interest Obligation, and (4) Compliance Obligation.*

RESPONSE: The allegations contained in paragraph 46 constitute legal conclusions to which no response is required.  To the extent paragraph 46 purports to characterize

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

26

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

47.    *The Care Obligation requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with a recommendation of a securities transaction to a retail customer.*

RESPONSE: The allegations contained in paragraph 47 constitute legal conclusions to which no response is required.  To the extent paragraph 47 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

48.    *The Adopting Release states that what constitutes reasonable diligence depends on, among other things, the complexity of, and risks associated with, the recommended security.*

RESPONSE: WIS states that paragraph 48 consists of characterizations to which no response is required.  To the extent any response is necessary, WIS refers to the Reg BI Adopting Release, which speaks for itself.  WIS denies any allegations that are inconsistent with the Reg BI Adopting Release.

49.    *The Care Obligation also requires a broker, dealer, or associated person to exercise reasonable diligence, care, and skill to have a reasonable basis to believe that their recommendation is in the best interest of the particular retail customer, based on that customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.*

RESPONSE: The allegations contained in paragraph 49 constitute legal conclusions to which no response is required.  To the extent paragraph 49 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.

50.    *The Adopting Release states that what is in the best interest of a retail customer depends on the facts and circumstances of the recommendation, including "matching" the recommended security to the retail customer's investment profile. Where the "match" between the retail customer profile and the recommendation appears less reasonable, it is more important for the broker*

*to establish that it had a reasonable belief that the recommendation was in the best interest of the retail customer.*

RESPONSE: WIS states that paragraph 50 consists of characterizations to which no response is required.  To the extent any response is necessary, WIS refers to the Reg BI Adopting Release, which speaks for itself.  WIS denies any allegations that are inconsistent with the Reg BI Adopting Release.

51. *The Adopting Release also states that, in addition to "matching" the recommendation to the customer's suitability profile, a registered representative should also exercise reasonable diligence, care, and skill to consider reasonably available alternatives.*

RESPONSE: WIS states that paragraph 51 consists of characterizations to which no response is required.  To the extent any response is necessary, WIS refers to the Reg BI Adopting Release, which speaks for itself.  WIS denies any allegations that are inconsistent with the Adopting Release.

52. *Reg BI's Compliance Obligation requires a broker-dealer to establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with Reg BI. According to the Adopting Release, a broker "should consider the nature of that firm's operations and how to design such policies and procedures to prevent violations from occurring, detect violations that have occurred, and to correct promptly any violations that have occurred."*

RESPONSE: The allegations contained in the first sentence of paragraph 52 constitute legal conclusions to which no response is required.  To the extent this sentence purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations that are inconsistent with the Rule.  To the extent the second sentence of paragraph 52 purports to quote or characterize the Reg BI Adopting Release, which speaks for itself, WIS denies any characterizations to the extent they are inconsistent with the Release.

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

28

WESTERN INTERNATIONAL SECURITIES INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

## IV.     Defendants' Conduct in Selling L Bonds to Retail Customers

*53.     Western employed numerous registered representatives, such as the Registered Representative Defendants. Western exercised control over the registered representatives by supervising their activities.*

RESPONSE: WIS denies the allegations in paragraph 53, except admits that it supervises its registered representatives.  Responding further, WIS states that its registered representatives are independent contractors.

*54.     Between July of 2020 and April of 2021, registered representatives of Western recommended and sold approximately $13.3 million in L Bonds to retail customers who were natural persons or the legal representative of a natural persons and who used the recommendation primarily for personal, family, or household purposes.*

RESPONSE: The allegations in paragraph 54 state a sales figure based on unspecified data.  Accordingly, WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 54 and, on that basis, denies them, except that WIS admits that its representatives recommended L Bonds to certain retail customers between July 2020 and April 2021.  Responding further, WIS states that the total amount of L Bond purchases in connection with the nine recommendations identified in the Complaint is approximately $635,000.

### A.     Due Diligence and Training

*55.     Prior to adding the June 2020 issuance of L Bonds to its list of approved investments for registered representatives to recommend, Western's Chief Compliance Officer ("CCO") performed due diligence. Among other things, the CCO reviewed GWG's most recent Form 10-K and a due diligence report drafted by a third party ("Due Diligence Report").*

RESPONSE: WIS admits the allegations in paragraph 55.  Responding further, the WIS CCO also reviewed additional documents.

*56.     The Due Diligence Report contained detailed analysis of the risks and rewards of L Bonds. However, the Chief Compliance Officer did not provide the Due Diligence Report to Western registered representatives, supervisors, or other compliance personnel.*

RESPONSE: WIS states that the first sentence of paragraph 56 consists of characterizations to which no response is required. To the extent any response is necessary, WIS refers to the Due Diligence Report, which speaks for itself, and denies any characterizations inconsistent with the Report. WIS admits the second sentence of paragraph 56. Responding further, WIS states that there is no requirement for WIS to provide due diligence reports to registered representatives, supervisors, or other compliance personnel and that due diligence reports are generally prepared and reviewed in connection with determining if a product could be in the best interest of at least some retail customers, not a particular retail customer. WIS also states that it mandated training sessions for registered representatives prior to recommending L Bonds to clients.

57.   *Although the 2020 Prospectus expressly stated L Bonds were only suitable for customers with "substantial financial resources," Western did not set any criteria or thresholds for its customers to invest in L Bonds. Western also did not restrict the sale of L Bonds to customers with certain risk profiles or investment objectives.*

RESPONSE: WIS admits that the Prospectus contained risk disclosures, which speak for themselves. To the extent paragraph 57 purports to quote or characterize the Prospectus, WIS denies any characterizations to the extent they are inconsistent with the Prospectus. Responding further, WIS states that it treated L Bonds as an alternative investment, which triggered heightened supervisory requirements. For example, WIS policies and procedures required the following in connection with L Bond purchases: (i) completion of disclosure forms; (ii) prospectus delivery; and (iii) follow-up on transactions where the total invested amount exceed 10% of the client's estimated net worth.

58.   *Prior to recommending them to customers, Western required each of its registered representatives to take an online training course on L Bonds. However, Western did not require registered representatives to take L Bond training on the current L Bond offering if they had already taken a training for*

*one of the prior issuances of L Bonds, notwithstanding the significant changes in GWG's business and finances following its transactions with Beneficient.*

RESPONSE: WIS admits only that its registered representatives were required to take a training course on L Bonds prior to recommending them and that it did not require its representatives to take the training course again before recommending a new issuance.  The remaining allegations are characterizations to which no response is required.  To the extent any response is necessary, WIS denies the allegations. Responding further, WIS states that Reg BI does not require representatives to receive additional training when an issuer announces changes in business or financing strategy.

### B.        Recommendation Process

59.    *When one of their customers purchased L Bonds, Western registered representatives completed a client disclosure form for alternative products (the "Client Disclosure Form"). These forms, which were a single page, contained information about the proposed investment, including the investment amount and the percentage of the customer's net worth (defined as total assets exclusive of home, home furnishings, and automobiles, minus total liabilities) and liquid net worth the investment would comprise, as well as a "rationale" for the recommended investment.*

RESPONSE: WIS admits that its policies and procedures required a Client Disclosure Form to be completed in connection with L Bond customer purchases, but states that the Client Disclosure Form speaks for itself, and WIS denies any allegation that is inconsistent with the form.  Responding further, WIS states that the Client Disclosure Form is required to be signed by the customer, the registered representative, and a registered principal of the firm.

60.    *Western customers and their registered representatives also completed a two-page Western client agreement (the "WIS Agreement"), which contained information about the customer's age, occupation, income, investment objectives, risk profile, and investing knowledge, among other things.*

RESPONSE: WIS admits that its policies and procedures required a Client

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

31

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

Agreement to be completed in connection with L Bond customer purchases, but states that the Client Agreement speaks for itself, and WIS denies any allegation that is inconsistent with the agreement.  Responding further, WIS states that its policies and procedures required registered representatives, customers, and supervisors to review and sign Client Agreements.  In addition, WIS states that, in signing the Client Agreement, customers confirmed that they had received the WIS Form CRS and Brokerage Services Disclosure Summary, which provided important information about WIS's services, compensation, and fees.

61.   *For L Bonds, Western customers and their registered representatives also filled out a GWG Bond Purchase Form. The GWG Bond Purchase Form contained information about the customers' L Bond investment, including the dollar amount and the term. They also contained information about the customer, including the total amount of alternative or illiquid investments the customer held and the percentage of the customer's liquid net worth that would be invested in alternative or illiquid investments after their L Bond purchase.*

RESPONSE: WIS admits that its policies and procedures required a GWG Bond Purchase Form to be completed in connection with L Bond customer purchases, but states that the GWG Bond Purchase Form speaks for itself, and WIS denies any allegation that is inconsistent with the form.  Responding further, WIS states that in signing the GWG Bond Purchase Form customers were required to affirm, among other things, that: (i) they had received, read, and understood the Prospectus, wherein the terms, conditions, and risks of the offering were described; (ii) the L Bonds were not traded, there was no public market for them, and the customer may not be able to sell them; (iii) L Bonds are a long-term investment and the customer had adequate means of providing for one's current needs; and (iv) the customer considered the investment suitable.

62.   *The customer's Client Disclosure Forms, current WIS Agreement, and GWG Bond Purchase Form were then reviewed and signed by a Western supervisor or the supervisor's delegate.*

RESPONSE: WIS admits that its policies and procedures required these documents

to be completed in connection with L Bond customer purchases and signed by WIS supervisory personnel, but states that the documents speak for themselves, and WIS denies any allegation that is inconsistent with the documents.

63. *The supervisor's, or the supervisor's delegate's, review consisted of ensuring the forms were filled out completely and verifying the L Bond investment did not exceed 10% of the customer's net worth.*

RESPONSE: WIS admits that its policies and procedures required a supervisory review to be completed in connection with L Bond customer purchases, but states that its policies speak for themselves, and WIS denies any allegation that is inconsistent with its policies.  Responding further, WIS states that the supervisory review required by WIS's policies and procedures includes additional steps.

64. *After the supervisors' review, the transaction paperwork was submitted to Western's compliance department for what they called "recordkeeping and surveillance." Western's compliance department verified the required documents had been submitted, there was no missing information or signatures on the forms, and that an explanation was provided if the purchase exceeded 10% of the customer's net worth. Western's compliance department did not examine whether an investment was in the customer's best interest.*

RESPONSE: WIS admits that its policies and procedures required a compliance review to be completed in connection with L Bond customer purchases, but states that its policies speak for themselves, and WIS denies any allegation that is inconsistent with its policies.  Responding further, WIS states that the compliance review required by WIS's policies and procedures includes additional steps.  WIS also states that Reg BI does not require its compliance department to examine whether recommendations are in a customer's best interest.

### C. Financial Compensation

65. *Western received a commission of 3.25-5% of the value of each L Bond sold by its registered representatives. The registered representative received approximately 85-90% of that commission, Western received approximately 10%, and sometimes the registered representative's supervisor received a small percentage.*

RESPONSE: WIS admits the allegations in paragraph 65. Responding further, WIS states that it earned approximately $9,000 in connection with the nine recommendations of L Bond purchases identified in the Complaint.

66.     In addition, Western received a fee of .75% of the total value of each 2- and 3-year L Bond it sold and 1% of the total value of each 5- and 7-year L Bond it sold.

RESPONSE: WIS admits the allegations in paragraph 66. Responding further, WIS states that it earned approximately $9,000 in connection with the nine recommendations of L Bond purchases identified in the Complaint.

67.     Defendants Cole, Egan, Gitipityapon, Graham, and Swan received aggregate commissions each of between approximately $5,400 and $32,500 for their post-June 30, 2020 sales of L Bonds.

RESPONSE: WIS admits the allegations in paragraph 67. Responding further, WIS states that these representatives, collectively, earned approximately $23,000 in connection with the recommendations of L Bond purchases identified in the Complaint.

68.     Western received approximately $187,000 in commissions and fees for L Bond sales made after June 30, 2020.

RESPONSE: WIS admits the allegations in paragraph 68. Responding further, WIS states that it earned approximately $9,000 in connection with the nine recommendations of L Bond purchases identified in the Complaint.

V.      **The Registered Representative Defendants Sold L Bonds without Adequately Understanding the Risks Associated with the Investment.**

69.     The Registered Representative Defendants each sold L Bonds pursuant to the 2020 Prospectus. Their sales are summarized in the chart below:

| Registered Representative | L Bond Sales July 2020 — April 2021 | Commissions from L Bond Sales July 2020 — April 2021 |
|---|---|---|
| Nancy Cole | $250,000 | $10,080 |
| Patrick Egan | $184,500 | (at least) $5,397 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

34

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

| Andy Gitipityapon | $330,000 | $9,548 |
|---|---|---|
| Steven Graham | $1,061,400 | $32,424 |
| Thomas Swan | $297,000 | $12,555 |

RESPONSE: The allegations in paragraph 69 state sales figures based on unspecified data. Accordingly, WIS admits that the individual Defendants recommended L Bonds to certain retail customers between July 2020 and April 2021 pursuant to the Prospectus, and that the individual Defendants earned commissions in connection with those purchases, except WIS lacks sufficient knowledge or information to verify certain of the sales figures in paragraph 69, and, on that basis, denies them.

70.     *These registered representatives recommended L Bonds to retail customers, despite having an insufficient, and sometimes erroneous, understanding of the investment.*

RESPONSE: WIS admits that the individual Defendants recommended L Bonds to certain retail customers. WIS lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 70 and therefore denies them.

71.     *The Registered Representative Defendants' knowledge of GWG and L Bonds was based on information and communications from GWG and its sales representatives.*

RESPONSE: WIS admits that the individual Defendants received information and communications from GWG and its sales representatives. WIS lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 71 and therefore denies them. Responding further, WIS states that the individual Defendants were provided with information and communications related to L Bonds from additional sources as well, including training provided by a third-party vendor.

72.     *Although all of the Registered Representative Defendants took a training course on GWG L Bonds, four of them (Cole, Gitipityapon, Egan, and Swan)*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

35

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

*took that training on a prior issuance of L Bonds, not those sold pursuant to the 2020 Prospectus.*

RESPONSE: WIS admits the allegations in paragraph 72.  Responding further, WIS states that Reg BI does not require representatives to take new training on every issuance of securities that they are permitted to sell.

73.   *Although Western's CCO received the Due Diligence Report, the CCO did not share the report or its contents with Western's registered representatives. None of the Registered Representative Defendants received or reviewed the Due Diligence Report.*

RESPONSE: WIS admits the allegations in paragraph 73.  Responding further, WIS states that Reg BI does not require that the CCO share the Due Diligence Report with WIS's registered representatives.

74.   *Each of the Registered Representative Defendants misunderstood important issues regarding GWG and L Bonds, as described below. Each of these issues were disclosed by GWG in the 2020 Prospectus and/or in its public filings, which were incorporated therein.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 74 and therefore denies them.  Responding further, WIS states that its policies require customers to be provided with a copy of the Prospectus for L Bond purchases.

### A.   Business Combination with Beneficient

75.   *As described above and as disclosed in the 2020 Prospectus, GWG's transactions with Beneficient resulted in a "significant reorientation" of GWG's business. After those transactions, GWG was no longer in the business of purchasing life insurance policies on the secondary market. Rather, GWG adopted Beneficient's business model of offering loans, other liquidity products, and related services to customers holding illiquid alternative assets.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 75 and, on that basis, denies them, except that WIS admits that certain information contained in paragraph 75 is reflected in the

Prospectus, which speaks for itself.  WIS denies any allegations inconsistent with the Prospectus.

76.   *Despite the significance of this change, and its disclosure in the 2020 Prospectus, several Registered Representative Defendants failed to use reasonable diligence, care, and skill to understand the business combination with Beneficient, Beneficient's business, or the impact of that business combination on the L Bonds' risk.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 76 and, on that basis, denies them, except that WIS admits that certain information contained in paragraph 76 is reflected in the Prospectus, which speaks for itself.  WIS denies any allegations inconsistent with the Prospectus.

77.   *For example, Defendant Cole did not know about the business combination with Beneficient until several months after she had recommended L Bonds to customers. At the time she sold $250,000 worth of L Bonds to Customers B and C, she believed GWG was continuing to invest in life insurance policies.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 77 and, on that basis, denies them, except that WIS admits that Defendant Cole sold $250,000 of L Bonds to customers. Responding further, WIS states that information related to GWG's business is contained in the Prospectus, which WIS required to be provided to customers.  To the extent the allegations in paragraph 77 are based on testimony, WIS states that the testimony transcript speaks for itself.

78.   *Swan also erroneously believed that GWG was continuing to invest in life insurance policies.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 78 and, on that basis, denies them. Responding further, WIS states that information related to GWG's business is contained in the Prospectus, which WIS required to be provided to customers.  To

the extent the allegations in paragraph 78 are based on testimony, WIS states that the testimony transcript speaks for itself.

79.    *Defendant Egan also failed to understand GWG's transactions with Beneficient erroneously believing that they were not significant.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 79 and, on that basis, denies them.  To the extent the allegations in paragraph 79 are based on testimony, WIS states that the testimony transcript speaks for itself.

80.    *Defendant Graham understood that there had been a change in GWG's business, but he did not adequately undertake to gain an understanding of Beneficient's business or assets.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 80 and, on that basis, denies them.  To the extent the allegations in paragraph 80 are based on testimony, WIS states that the testimony transcript speaks for itself.

### B.    Risk Profile of GWG L Bonds

81.    *As described above and as disclosed in the 2020 Prospectus, investing in L Bonds involves a "high degree of risk," including the risk of losing one's entire investment. The 2020 Prospectus further states investing in L Bonds "may be considered speculative." Notwithstanding these disclosures, several of the Registered Representative Defendants did not understand the risk of L Bonds.*

RESPONSE: WIS admits only that the Prospectus contained risk disclosures, which speak for themselves, and WIS denies any allegations that are inconsistent with the Prospectus.  WIS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 81 and, on that basis, denies them.

82.    *For example, defendants Cole and Swan both did not consider L Bonds to be high risk, instead describing them as relatively safe.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

38

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

the truth of the allegations in paragraph 82 and, on that basis, denies them.  To the extent the allegations in paragraph 82 are based on testimony, WIS states that the testimony transcript speaks for itself.

83.    *Defendant Egan, on the other hand, acknowledged that the 2020 Prospectus described the L Bonds as high risk, but disregarded that disclosure.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 83 and, on that basis, denies them.  To the extent the allegations in paragraph 83 are based on testimony, WIS states that the testimony transcript speaks for itself.

### C.    Collateral Securing L Bonds

84.    *As described above and on the first page of the 2020 Prospectus, GWG L Bonds are not directly collateralized by life insurance policies. Rather, they are primarily secured by GWG's equity ownership interests in certain GWG subsidiaries. Although certain of those subsidiaries held life insurance policies, the L Bond investors' claims to those policies were subordinate to the interests of creditors of those entities. Put another way, other creditors had first claim on those life insurance policies, not the L Bond investors. This was important, because the value of GWG's life insurance portfolio was not sufficient to repay all of GWG's outstanding debt.*

RESPONSE: The allegations contained in the first four sentences of paragraph 84 are characterizations of the Prospectus that do not require a response.  The Prospectus speaks for itself, and WIS denies any allegations in paragraph 84 to the extent they are inconsistent with the Prospectus.  WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegation in the fifth sentence of paragraph 84 and, on that basis, denies it.

85.    *However, defendants Gitipityapon, Swan, and Egan did not understand the nature of the collateral for L Bonds. They failed to appreciate the life insurance policies themselves did not collateralize the bonds.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 85 and, on that basis, denies them.  To the

extent the allegations in paragraph 85 are based on testimony, WIS states that the testimony transcript speaks for itself.

### D.   Beneficient's Profitability

86.   *As described above, both GWG and Beneficient had histories of substantial net losses. These net losses were readily apparent in GWG's 2019 Form 10-K filing, which was incorporated into the 2020 Prospectus.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in the first sentence of paragraph 86, and, on that basis, denies them.  The allegations contained in the second sentence of paragraph 86 purport to describe and characterize language used in GWG's 2019 Form 10-K filing. The filing speaks for itself, and WIS denies any allegations in paragraph 86 to the extent they are inconsistent with the filing.

87.   *However, several of the Registered Representative Defendants knew little, if anything, about Beneficient's finances, including its history of operating losses, and did nothing to educate themselves.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 87 and, on that basis, denies them.  To the extent the allegations in paragraph 87 are based on testimony, WIS states that the testimony transcripts speak for themselves.

88.   *For example, Egan acknowledged that he should have reviewed Beneficient's financial statements and admitted he did not do so, but rather erroneously assumed that Beneficient was profitable.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 88 and, on that basis, denies them.  To the extent the allegations in paragraph 88 are based on testimony, WIS states that the testimony transcript speaks for itself.

89.   *Defendant Gitipityapon did not know how Beneficent made its money or whether it was generating revenues and did nothing to determine if it was.*

RESPONSE: WIS lacks knowledge or information sufficient to form a belief about

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

40

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

the truth of the allegations in paragraph 89 and, on that basis, denies them.  To the extent the allegations in paragraph 89 are based on testimony, WIS states that the testimony transcript speaks for itself.

**VI.    The Registered Representative Defendants Recommended L Bonds to Retail Customers Without a Reasonable Basis to Believe the Investments Were in Those Customers' Best Interest.**

90.    *The Registered Representative Defendants recommended L Bonds without a reasonable basis to believe they were in the best interests of at least seven retail customers.*

RESPONSE: WIS denies the allegations in paragraph 90.

91.    *For the reasons discussed above, L Bonds might be appropriate for certain customers willing to accept a substantial degree of risk, who are interested in investing in something that could be considered to be speculative, and who have substantial financial resources and no need for liquidity. However, the Registered Representative Defendants recommended L Bonds to customers who fell outside those parameters.*

RESPONSE: The first sentence of paragraph 91 consists of characterizations and legal conclusions to which no response is required.  To the extent any response is necessary, WIS denies the allegations, except to state that the Prospectus describes the nature of that L Bond offering and speaks for itself.  WIS denies any characterization of L Bonds in paragraph 91 that is inconsistent with the Prospectus.  WIS denies the second sentence of paragraph 91.

92.    *Given the mismatch between these customers and the high-risk L Bonds, these Registered Representative Defendants did not demonstrate reasonable diligence, care, or skill in determining that the L Bonds were in their customers' best interests.*

RESPONSE: WIS denies the allegations in paragraph 92.

### A.    Customer A

93.    *Defendant Graham recommended L Bonds to a retail customer who purchased $100,000 in two-year L Bonds in or around November 2020 ("Customer A").*

RESPONSE: WIS admits the allegations in paragraph 93, with the reservation that

WIS has not confirmed the identity of Customer A with the SEC, and the recommendation was provided in October 2020.

94.     *Customer A was a 79-year-old retired truck driver with a moderate risk tolerance whose investment objectives did not include speculation. Customer A had limited general investment knowledge and limited knowledge of bonds. At the time of his L Bond purchase, Customer A's annual income was $35,000 and his liquid net worth was $300,000. The L Bond investment comprised 10% of Customer A's net worth and 33% of his liquid net worth.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 94 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 94 is reflected in account- and transaction-related documentation for a customer of the firm.  Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents.   WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

95.     *Customer A made his L Bond investment in his individual retirement account and planned to use the L Bond investment primarily for personal use.*

RESPONSE: WIS denies the allegations in paragraph 95, except that WIS admits that the information provided in paragraph 95 with respect to the planned use of the L Bond investment is reflected in account- and transaction-related documentation for a customer of the firm.  Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

96.     *In the "rationale" section of the Client Disclosure Form for Customer A's L Bond investment, defendant Graham wrote, in full: "Customer is seeking a higher rate of interest from funds sitting in a bank savings at .05%. They will utilize the interest for supplemental income each month."*

RESPONSE: WIS admits that the information provided in paragraph 96 is reflected in a Client Disclosure Form for a customer of the firm.  The Client Disclosure Form speaks for itself, and WIS denies any allegation that is inconsistent with the form.

WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

97.  *Nowhere did defendant Graham document why he believed L Bonds specifically were in Customer A's best interest or why he chose to recommend L Bonds to Customer A as opposed to the many other investments that offered greater than .05% interest rates.*

RESPONSE: WIS denies that nowhere did defendant Graham document why he believed L Bonds specifically were in Customer A's best interest, and states that WIS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 97 and, on that basis, denies them. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

98.  *Defendant Graham's bases for believing that $100,000 L Bond purchase was in Customer A's best interest were unreasonable, vague, and generic. Defendant Graham did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer A were in Customer A's best interest.*

RESPONSE: WIS denies the allegations in paragraph 98. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

99.  *Neither defendant Graham's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns with Customer A's L bond investment.*

RESPONSE: WIS denies the allegations in paragraph 99, and states that WIS's policies and procedures establish a process for the supervision and review of transactions. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer A with the SEC.

**B.  Customers B and C**

100.  *Defendant Cole recommended L Bonds to a married couple of retail customers ("Customer B" and "Customer C"). Customers B and C collectively*

*purchased $250,000 in two-, three-, five-, and seven-year L Bonds in or around December 2020.*

RESPONSE: WIS admits the allegations in paragraph 100, with the reservation that WIS has not confirmed the identities of Customers B and C with the SEC, and the recommendations were provided in October 2020.

101. *At the time of the recommendation, Customers B and C were 67 and 61 years old, respectively. Customer B was retired. Although their WIS Agreements listed their risk tolerance as moderate, defendant Cole described them as "not risk takers," and "relatively conservative." Customers B and C had investment objectives that did not include speculation. They had limited general knowledge and limited knowledge of bonds. According to their WIS Agreements, Customers B and C collectively had an annual income of $106,000 and a liquid net worth of approximately $760,000. The L Bond investments comprised 12% of the net worth and 33% of the liquid net worth of Customers B and C.*

RESPONSE: WIS admits the sixth sentence of paragraph 101, with the reservation that WIS has not confirmed the identities of Customers B and C with the SEC.  WIS lacks sufficient knowledge or information to form a belief as to the truth of the remaining allegations in paragraph 101 and, on that basis, denies them, except that WIS admits that the remaining information provided in paragraph 101 is reflected in account- and transaction-related documentation for a customer of the firm.  Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents.  WIS submits this response with the reservation that WIS has not confirmed the identities of Customers B and C with the SEC.

102. *Customers B and C made their L Bond investments in their personal retirement accounts and a joint investment account, and they planned to use proceeds from the L Bond investment primarily for personal use.*

RESPONSE: WIS admits that the information provided in paragraph 102 is reflected in a Client Agreement Form for a customer of the firm.  The form speaks for itself, and WIS denies any allegation that is inconsistent with the form.  WIS submits this

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

44

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

response with the reservation that WIS has not confirmed the identities of Customers B and C with the SEC.

103.   *Defendant Cole's bases for believing $250,000 in L Bonds were in Customers B and C's best interest were unreasonable. Her bases included L Bonds' good returns and her understanding that the L Bonds were not too risky. However, defendant Cole's understanding of L Bonds' risk profile was based on her misunderstanding of GWG's business and the collateral for L Bonds, described above. Accordingly, defendant Cole did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe her recommendation of L Bonds to Customers B and C were in their best interest.*

RESPONSE: WIS denies the allegations in the first, second, and fourth sentences of paragraph 103.  WIS lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 103, and, on that basis, denies them.  WIS submits this response with the reservation that WIS has not confirmed the identities of Customers B and C with the SEC.

### C.   Customer D

104.   *Defendant Graham recommended L Bonds to a retail customer who purchased $100,000 in 3-year L Bonds in or around January 2021 ("Customer D").*

RESPONSE: WIS admits the allegations in paragraph 104, with the reservation that WIS has not confirmed the identity of Customer D with the SEC, and the recommendation was provided in December 2020.

105.   *Customer D was a 65-year-old retiree. He had a moderate risk tolerance and his investment objectives did not include speculation. Customer D's investor profile indicated – paradoxically – that he had no general investment knowledge and limited knowledge of bonds. Customer D had an annual income of $85,000, a net worth of $1,100,000, and a liquid net worth of $500,000. The L Bonds constituted 9% of Customer D's net worth and 20% of his liquid net worth.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 105 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 105 is reflected in

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

45

WESTERN INTERNATIONAL SECURITIES INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

account- and transaction-related documentation for a customer of the firm. Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

106. *Just three months prior to his investment in L Bonds, Customer D had reported a net worth of only $250,000. It was only after Customer D expressed interest in purchasing a larger amount of L Bonds and being told by Graham he would need a higher net worth to do so, that Customer D told Graham he had $800,000 in gold. Graham did not question the significant increase in Customer D's net worth and did nothing to confirm the existence of the additional assets.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 106 and, on that basis, denies them, except that WIS admits that the information provided in the first sentence of paragraph 106 is reflected in account- and transaction-related documentation for a customer of the firm. Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

107. *Customer D made his L Bond investment in his individual retirement account and planned to use the investment primarily for personal use.*

RESPONSE: WIS admits that the information provided in paragraph 107 is reflected in a Client Agreement Form for a customer of the firm. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

108. *In the rationale included in the Client Disclosure Form for Customer D's L Bond purchase, defendant Graham wrote that Customer D was "seeking an additional income stream to supplement his retirement income" and that he wanted to "leverage a small portion of his IRA portfolio to accomplish this."*

RESPONSE: WIS admits that the information provided in paragraph 108 is reflected

in a Client Disclosure Form for a customer of the firm. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

109. *However, the L Bonds were not a "small portion" of Customer D's IRA portfolio; the $100,000 in L Bonds Customer D purchased constituted 50% of his Western IRA, which was the only IRA portfolio defendant Graham was aware Customer D had. Neither defendant Graham's supervisor, his supervisor's delegate, nor Western's compliance department identified the discrepancy.*

RESPONSE: WIS states that the first sentence of paragraph 109 consists of generalizations and characterizations to which no response is required. To the extent a response is required, WIS denies the allegations. WIS further denies the allegations in the second sentence of paragraph 109 that the form created a discrepancy. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

110. *Defendant Graham's bases for believing that the $100,000 L Bond purchase was in Customer D's best interest were unreasonable. They were vague, generic, and premised on an erroneous assumption. Defendant Graham did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer D were in Customer D's best interest.*

RESPONSE: WIS denies the allegations in paragraph 110. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

111. *Neither defendant Graham's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns regarding Customer D's L Bond purchase.*

RESPONSE: WIS denies the allegations in paragraph 111, and states that WIS's policies and procedures establish a process for the supervision and review of transactions. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer D with the SEC.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

47

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

### D. Customer E

112. *Defendant Gitipityapon recommended L Bonds to a retail customer who purchased $30,000 in 2-year L Bonds in or around August 2020 ("Customer E").*

RESPONSE: WIS admits the allegations in paragraph 112, with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

113. *Customer E was a 54-year-old restaurant server. Her risk tolerance was moderate and her investment objectives did not include speculation. She had an annual income of $75,000, a net worth of $400,000 and a liquid net worth of $150,000. Her $30,000 L Bond investment represented 7.5% of her net worth and 20% of her liquid net worth.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 113 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 113 is reflected in account- and transaction-related documentation for a customer of the firm. Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

114. *Customer E purchased the L Bonds in her individual account and planned to use the interest accrued from them primarily for personal purposes.*

RESPONSE: WIS admits that the information provided in paragraph 114 is reflected in a Client Agreement Form for a customer of the firm. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

115. *In the rationale section of the Client Disclosure Form, defendant Gitipityapon wrote, in full: "Client had a CD that came due and does not need the funds for a few years. She likes the interest rate of the bond and understands the risk of the GWG bond. This bond meets all of her need and objectives."*

RESPONSE: WIS admits that the information provided in paragraph 115 is reflected

in a Client Disclosure Form for a customer of the firm.  The form speaks for itself, and WIS denies any allegation that is inconsistent with the form.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

116.  *Defendant Gitipityapon's bases for believing that the L Bond purchase was in Customer E's best interest were unreasonable, vague, and generic. Accordingly, defendant Gitipityapon did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer E were in Customer E's best interest.*

RESPONSE: WIS denies the allegations in paragraph 116.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

117.  *Neither defendant Gitipityapon's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns regarding Customer E's L Bond purchase.*

RESPONSE: WIS denies the allegations in paragraph 117, and states that WIS's policies and procedures establish a process for the supervision and review of transactions.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer E with the SEC.

### E.   Customer F

118.  *Defendant Swan recommended L Bonds to a retail customer who purchased $55,000 in seven-year L Bonds in or around August 2020 ("Customer F").*

RESPONSE: WIS admits the allegations in paragraph 118, with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

119.  *Customer F was a 66-year-old retiree with an annual income of $30,000. Customer F's investment objectives did not include speculation. Customer F had a liquid net worth of $550,000. Her $55,000 L Bond investment represented approximately 5% of her net worth and 10% of her liquid net worth.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to

the truth of the allegations in paragraph 119 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 119 is reflected in account- and transaction-related documentation for a customer of the firm. Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

120.  *Customer F purchased L Bonds directly, as an individual.*

RESPONSE: WIS admits the allegations in paragraph 120, expect to clarify that the purchase was made in Customer F's Traditional IRA Account, with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

121.  *Customer F had previously informed Swan that she did not want any capital risk to the money that provides the income portion of her retirement savings.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 121 and, on that basis, denies them. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

122.  *Although Customer F's WIS Agreement lists her risk profile as moderate, in the Client Disclosure Form that accompanied Customer F's L Bond purchase, defendant Swan described her as "a conservative investor[.]" Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department identified this discrepancy.*

RESPONSE: WIS admits that the information provided in the first sentence of paragraph 122 is reflected in a Client Disclosure Form for a customer of the firm. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS denies the allegations in the second sentence of paragraph 122 that the forms created a discrepancy. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

123. *During a previous review of her IRA investments with Defendant Swan, Customer F had told him she wanted to earn income safely without risking her principal.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 123 and, on that basis, denies them. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

124. *Defendant Swan's bases for believing that $55,000 L Bond purchase was in Customer F's best interest were unreasonable, vague, and unsupported. Accordingly, defendant Swan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer F were in Customer F's best interest.*

RESPONSE: WIS denies the allegations in paragraph 124. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

125. *Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions of concerns regarding Customer F's L Bond purchase.*

RESPONSE: WIS denies the allegations in paragraph 125, and states that WIS's policies and procedures establish a process for the supervision and review of transactions. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer F with the SEC.

### F.    Customer G

126. *Defendant Swan also recommended L Bonds to another retail customer who purchased $80,000 of 7-year L Bonds in or around August 2020 ("Customer G").*

RESPONSE: WIS admits the allegations in paragraph 126, with the reservation that WIS has not confirmed the identity of Customer G with the SEC.

127. *Customer G was a 66-year-old retiree. Her risk tolerance was moderate-conservative. Customer G identified preservation of capital as one of her investment objectives, but not speculation. Customer G had an annual income of $75,000, a net worth of $1,500,000 and a liquid net worth of $900,000. Customer G had limited general knowledge and limited knowledge of bonds.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

51

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 127 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 127 is reflected in account- and transaction-related documentation for a customer of the firm. Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer G with the SEC.

128.  *Customer G purchased the L Bonds in her individual account and planned to use the interest accrued from them primarily for personal purposes.*

RESPONSE: WIS admits that the information provided in paragraph 128 is reflected in a Client Agreement Form for a customer of the firm, except to clarify that the purchase was made in the customer's Traditional IRA Account. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer G with the SEC.

129.  *Defendant Swan's bases for believing that an $80,000 L Bond purchase was in Customer G's best interest were unreasonable, vague, and unsupported. Accordingly, defendant Swan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer G were in Customer G's best interest.*

RESPONSE: WIS denies the allegations in paragraph 129. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer G with the SEC.

130.  *Neither defendant Swan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions of concerns regarding Customer G's L Bond purchase.*

RESPONSE: WIS denies the allegations in paragraph 130, and states that WIS's policies and procedures establish a process for the supervision and review of transactions. WIS submits this response with the reservation that WIS has not

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

52

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

confirmed the identity of Customer G with the SEC.

### G.   Customer H

131.   *Defendant Egan recommended L Bonds to a customer who invested $20,000 in 3-year L Bonds in or around August 2020 ("Customer H").*

RESPONSE: WIS admits the allegations in paragraph 131, with the reservation that WIS has not confirmed the identity of Customer H with the SEC, and the recommendation was provided in July 2020.

132.   *Customer H was a 75 year-old retiree with a moderate conservative risk profile. Customer H had an annual income of $50,000, a net worth of $250,000 and a liquid net worth of $250,000. Customer H did not include speculation as an investment objective and had limited knowledge of investments in general and a limited knowledge of bonds. Customer H's $20,000 L Bond purchase represented 8% of both his net worth and liquid net worth.*

RESPONSE: WIS lacks sufficient knowledge or information to form a belief as to the truth of the allegations in paragraph 132 and, on that basis, denies them, except that WIS admits that the information provided in paragraph 132 is reflected in account- and transaction-related documentation for a customer of the firm.  Those documents speak for themselves, and WIS denies any allegation that is inconsistent with those documents.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

133.   *Customer H purchased the L Bonds in his individual account and planned to use the interest accrued from them primarily for personal purposes.*

RESPONSE: WIS admits that the information provided in paragraph 133 is reflected in a Client Agreement Form for a customer of the firm.  The form speaks for itself, and WIS denies any allegation that is inconsistent with the form.  WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

Morgan, Lewis &
Bockius LLP
Attorneys at Law
San Francisco

53

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

134.   *In the rationale section of the Client Disclosure Form for Customer H's L Bond investment, defendant Egan wrote, in full: "Client had extra cash in the bank and wanted to earn more interest than can be done in his bank. Client will also have a large cash balance in his bank account in addition to the $20,000 at GWG."*

RESPONSE: WIS admits that the information provided in paragraph 134 is reflected in a Client Disclosure Form for a customer of the firm. The form speaks for itself, and WIS denies any allegation that is inconsistent with the form. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

135.   *Besides the rationale section of the Client Disclosure Form, defendant Egan did not document anywhere his bases for believing that the $20,000 L Bond purchase was in Customer H's best interest. Nowhere did defendant Egan document why he believed L Bonds specifically were in Customer H's best interest or why he chose to recommend L Bonds to Customer H as opposed to the many other investments that offered higher than interest rates than a bank account.*

RESPONSE: WIS denies the allegations in paragraph 135. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

136.   *Defendant Egan's bases for believing that the $20,000 L Bond purchase was in Customer H's best interest — including that they were lower risk than other alternative investments and that all of the life insurance policies held by GWG served as collateral for the L Bonds — were unreasonable and not supported by the facts disclosed in the 2020 Prospectus. Accordingly, defendant Egan did not exercise reasonable diligence, care, and skill to have a reasonable basis to believe his recommendation of L Bonds to Customer H were in Customer H's best interest.*

RESPONSE: WIS denies the allegations in paragraph 136. WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

137.   *Neither defendant Egan's supervisor, the supervisor's delegate, nor Western's compliance department raised any questions or concerns regarding Customer H's L Bond purchase.*

RESPONSE: WIS denies the allegations in paragraph 137, and states that WIS's policies and procedures establish a process for the supervision and review of transactions.   WIS submits this response with the reservation that WIS has not confirmed the identity of Customer H with the SEC.

**VII.   Western's Policies and Procedures Were Insufficient.**

138.   *Reg BI's Compliance Obligation requires brokers or dealers to (a) establish, (b) maintain, and (c) enforce written policies and procedures reasonably designed to achieve compliance with Reg BI.*

RESPONSE: The allegations contained in paragraph 138 constitute legal conclusions to which no response is required.   To the extent paragraph 138 purports to characterize or summarize Reg BI, the Rule speaks for itself, and WIS denies any allegations in paragraph 138 that are inconsistent with the Rule.

139.   *Western maintains its policies and procedures in a document called "Written Supervisory Procedures" ("WSPs"). Western updated its WSPs on June 30, 2020 to include a section discussing the requirements of Reg BI. After that, Western made no substantive changes to the Reg BI section of its WSPs during the time it was selling L Bonds.*

RESPONSE: WIS admits the allegations in the first and second sentence of paragraph 139, except to clarify that the changes made to the WSPs related to Reg BI were not limited to the specific section regarding Reg BI.   WIS denies the third sentence of paragraph 139.   Responding further, WIS states that the section of its policies and procedures specific to Reg BI is eleven (11) pages long and includes sections on covered investment recommendations, retail customers, disclosure obligation requirements, care obligation requirements, conflict-of-interest obligation, compliance obligation, and record-making and recordkeeping.

140.   *Western's parent, Atria, provided Western with draft policies and procedures regarding Reg BI, which Western incorporated into its June 30, 2020 WSPs.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

55

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

*Western's Reg BI policies and procedures are substantially copied from a Small Entity Compliance Guide released to the public by the SEC in September of 2019. See https://www.sec.gov/info/smallbus/secg/regulation-best-interest. Accordingly, they contain general language and are not tailored to Western's business. They also do not include mechanisms for enforcing the policies and procedures.*

RESPONSE: WIS admits the allegations in the first sentence of paragraph 140. WIS denies the remaining allegations in paragraph 140. Responding further, WIS states that it is not a violation for WIS to incorporate Reg BI guidance from the SEC Small Entity Compliance Guide into WIS's policies and procedures. WIS also added language to its policies and procedures that is different from the SEC Small Entity Compliance Guide, such as training requirements for complex products.

141. *For example, with respect to Reg BI's Care Obligation, the Western WSPs state registered representatives "should consider reasonably available alternatives offered by [Western] in determining whether there is a reasonable basis for making the recommendation." This language is taken almost verbatim from the SEC's Small Entity Compliance Guide. Western, however, provides no explanation of what may or may not constitute a reasonably available alternative and no procedures or guidelines for registered representatives or supervisors to follow in determining how to comply with the requirement.*

RESPONSE: WIS admits the allegations in the first sentence of paragraph 141. WIS denies the remaining allegations in paragraph 141. Responding further, WIS repeats that it is not a violation for WIS to incorporate Reg BI guidance from the SEC Small Entity Compliance Guide into WIS's policies and procedures.

142. *As another example, Western's WSPs contain a subsection that instructs the registered representatives to take "particular care" in dispensing their Care Obligation with respect to complex or risky products, such as L Bonds. This section, too, is mostly taken from the SEC's Small Entity Compliance Guide. Again, Western does not elaborate or provide any specific guidance as to which investments are risky or how registered representatives should exercise this "particular care[.]"*

RESPONSE: WIS admits the allegations in the first sentence of paragraph 142,

except to the extent the allegations are inconsistent with WIS's policies and procedures. WIS denies the remaining allegations in paragraph 142. Responding further, WIS repeats that it is not a violation for WIS to incorporate Reg BI guidance from the SEC Small Entity Compliance Guide into WIS's policies and procedures. In addition, WIS also added language to its policies and procedures that is different from the SEC Small Entity Compliance Guide, such as training requirements for complex products. WIS further states that it treated L Bonds as an alternative investment, which triggered heightened supervisory requirements. For example, WIS policies and procedures required the following in connection with L Bond purchases: (i) completion of disclosure forms; (ii) prospectus delivery; and (iii) follow-up on transactions where the total invested amount exceeds 10% of the client's estimated net worth. WIS also states that the term "particular care" is included in the SEC Small Entity Compliance Guide and is not defined.

143. *Western's other policies and procedures — those not specifically addressing Reg BI — were also insufficient. For example, Western's WSPs state that each offering "will have specific suitability standards including information such as the purchaser's income and net worth," and instructs Western's registered representatives to ensure the purchaser meets those standards. However, Western's WSPs provide no guidance for offerings - such as L Bonds - where the issuer does not establish specific suitability standards.*

RESPONSE: WIS denies the allegations in paragraph 143. Responding further, WIS states that it treated L Bonds as an alternative investment, which triggered heightened supervisory requirements. For example, WIS policies and procedures required the following in connection with L Bond purchases: (i) completion of disclosure forms; (ii) prospectus delivery; and (iii) follow-up on transactions where the total invested amount exceeds 10% of the client's estimated net worth.

144. *As another example, the WSPs directed Western's compliance personnel to "follow up with the representative and supervisor regarding inconsistencies with the account paperwork," but only "where total invested amounts exceed 10% of the client's net worth."*

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

57

WESTERN INTERNATIONAL SECURITIES INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

RESPONSE: WIS denies the allegations in paragraph 144. Responding further, WIS states that the compliance review required by WIS's policies and procedures is in addition to the supervisory review.

145. *Taken as a whole, Western's policies and procedures in effect during the time it was recommending L Bonds were not reasonably designed to achieve compliance with Reg BI's Care Obligation requirement that its registered representatives understand the potential risks, rewards, and costs associated with their recommendation of L Bonds. These failures include, but are not limited to:*

*(a)     Although Western's policies and procedures required Western registered representatives to complete an online training prior to selling L Bonds, this policy either was not enforced or was enforced in such a way that it failed to ensure registered representatives adequately understood L Bonds. Despite the "significant reorientation" of GWG's business that was completed at the end of 2019, Western's registered representatives who took a training on a previous issuance of L Bonds, prior to that reorientation, were not required to take another training for the 2020 issuance*

*(b)     Western's policies regarding its due diligence procedures for alternative investments required Western's CCO to review the Due Diligence report but did not require any other Western personnel, including supervisors and registered representatives, to receive or review the report. The Due Diligence Report contained detailed analysis of the L Bonds and GWG and could have helped Western's supervisors and registered representatives understand the risks, rewards, and costs associated with L Bonds.*

RESPONSE: WIS denies the allegations in paragraph 145.

146. *In addition, Western's policies and procedures during the time it was recommending L Bonds were not adequately designed to achieve compliance with Reg BI's Care Obligation requirement that its registered representatives use reasonable diligence, care, and skill to form a reasonable basis to believe L Bonds were in the best interests of particular retail customers to whom they were recommended. These failures include, but are not limited to:*

*(a)     As discussed above, although Western's policies and procedures require its registered representatives to consider reasonably available alternatives to investment recommendations, they provide no specific guidance for how to do so.*

*(b)     Although Western required registered representatives to provide an investment "rationale" on the Client Disclosure Forms, Western policies and*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

58

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

*procedures provide no guidance or instruction as to the purpose of the "rationale" section of the Client Disclosure Form or what information should be included.*

*(c) Although the 2020 Prospectus explained that an investment in L Bonds was suitable only for persons with "substantial financial resources," Western neither provided guidance as to what constituted "substantial financial resources" for the purposes of an L Bond investment, nor did its WSPs set any limits on who could invest in L Bonds through Western.*

RESPONSE: WIS denies the allegations in paragraph 146.

147. *Because Western's policies and procedures were so vague, Western personnel had a limited ability to enforce those policies, as required by Reg BI's Compliance Obligation. Western's deficiencies in this regard include, but are not limited to:*

*(a) Due to Western's vague written policies, there was confusion as to who, at Western, was responsible for reviewing transactions for suitability and compliance with Reg BI's Care Obligation.*

*(b) Western had no written policies or procedures guiding its supervisors' review as to whether a transaction was in a customer's best interest for the purpose of complying with Reg BI.*

*(c) Western had no written policies or procedures guiding its compliance department's review of transactions under Reg BI.*

*(d) Western had no written policies or procedures guiding its supervisors as to the purpose of the "rationale" in the Client Disclosure Forms, what is was supposed to communicate, or how they were to review the rationales to enforce compliance with Reg BI.*

RESPONSE: WIS denies the allegations in paragraph 147.

148. *In practice, Western and its agents repeatedly did not enforce what policies and procedures that Western did have to achieve compliance with Reg BI's Care Obligation. For example:*

*(a) The WSPs directed Western supervisors to identify "discrepanc[ies]" including when "the net worth amount is significantly increased," and to request a "sufficient explanation" for the discrepancy from the registered representative or "reach out to the customer for clarification." However, with respect to the discrepancies described in paragraphs 106, 109, and 122 above, those procedures were not followed*

*(b) Western's WSPs directed the compliance personnel responsible for conducting "surveillance" of alternative investments such as L Bonds to "review and consider" due diligence material, among other things. However,*

59

*Western's CCO never provided compliance personnel with the Due Diligence Report for L Bonds.*

RESPONSE: WIS denies the allegations in paragraph 148.

## FIRST CLAIM FOR RELIEF
**Violation of Reg BI's General Obligation**
**[Rule 151-1(a)(1) of the Exchange Act, 17 CFR § 240.151-1(a)(1)].**
**(Against all Defendants)**

149.   *The SEC realleges and incorporates by reference paragraphs 1 through 148 above.*

RESPONSE: WIS incorporates by reference its responses to paragraphs 1 through 148.

150.   *By engaging in the conduct described above Western failed to act in the best interest of the retail customers by failing to establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with Regulation Best Interest.*

RESPONSE: WIS denies the allegations in paragraph 150.

151.   *By engaging in the conduct described above, when making recommendations of securities transaction to retail customers, defendants Western, Cole, Egan, Gitipityapon, Graham, and Swan failed to act in the best interest of the retail customers by failing to exercise reasonable diligence, care, and skill to understand the potential risks, rewards, and costs associated with the recommendation.*

RESPONSE: WIS denies the allegations in paragraph 151.

152.   *Also, by engaging in the conduct described above, defendants Western Cole, Egan, Gitipityapon, Graham, and Swan made recommendations to retail customers without exercising reasonable diligence, care, and skill to have a reasonable basis to believe the recommendations were in the best interests of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.*

RESPONSE: WIS denies the allegations in paragraph 152.

153.   *The failure of Western to comply with Regulation Best Interest's Compliance Obligation, and the failures of Defendants Western, Cole, Egan, Gitipityapon,*

*Graham, and Swan to comply with Regulation Best Interest's Care Obligation, constitute violations of Regulation Best Interest's General Obligation.*

RESPONSE: WIS denies the allegations in paragraph 153.

154. *By reason of the foregoing, Western, Cole, Egan, Gitipityapon, Graham, and Swan violated, and unless restrained and enjoined will continue to violate, Rule 151-1(a)(1) of the Exchange Act, 17 CFR § 240.151-1(a)(1).*

RESPONSE: WIS denies the allegations in paragraph 154.

## SECOND CLAIM FOR RELIEF
**Control Person Liability Under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a) for Defendants Cole, Egan, Gitipityapon, Graham, and Swan's Violations of Rule 151-1(a)(1) of the Exchange Act, 17 CFR § 240.151-1(a)(1). (Against Western)**

155. *The SEC realleges and incorporates by reference paragraphs 1 through 148 above.*

RESPONSE: WIS incorporates by reference its responses to paragraphs 1 through 154.

156. *By virtue of the foregoing, Defendants Cole, Egan, Gitipityapon, Graham, and Swan committed violations of Exchange Act Rule 151-1(a)(1) by making recommendations to purchase L Bonds to retail customers while failing to exercise reasonable diligence, care, and skill to (a) understand the potential risks, rewards, and costs associated with the recommendation; and (b) form a reasonable basis to believe that the recommendation was in the best interest of the particular retail customer based on that retail customer's investment profile and the potential risks, rewards, and costs associated with the recommendation.*

RESPONSE: The allegations in Paragraph 156 are directed to the individual Defendants and no response by WIS is required. To the extent any response is necessary, WIS denies the allegations.

157. *Western exerted control over the activities of its registered representatives, including the specific activity upon which the Registered Representative Defendants' violations are based.*

RESPONSE: WIS denies the allegations in paragraph 157.

*158. By reason of the foregoing, Western is liable as a control person for Defendant Cole's, Egan's, Gitipityapon's, Graham's, and Swan's violations pursuant to Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)].*

RESPONSE:  WIS denies the allegations in paragraph 158.

## PRAYER FOR RELIEF

Plaintiff's prayer for relief and judgment does not require a response, but to the extent any response is necessary, WIS denies that Plaintiff is entitled to any of the requested relief.

## JURY DEMAND

WIS admits that Plaintiff demands a trial by jury.

## AFFIRMATIVE DEFENSES

WIS alleges, asserts, and states the following defenses as separate and distinct defenses to the Complaint.  WIS incorporates in the following affirmative defenses its Preliminary Statement (Paragraphs 1-40 of this Answer) and the facts admitted above in response to the allegations of the Complaint.  By virtue of alleging these further defenses, WIS does not assume any burden of proof, persuasion, or production not otherwise legally assigned to it.

## FIRST DEFENSE: LACK OF FAIR NOTICE

In contravention of WIS's due process rights, the SEC failed to provide WIS with fair notice that its conduct allegedly violated Reg BI.  Due process requires that laws and regulations provide a person of ordinary intelligence with a reasonable opportunity to know what is prohibited.  Regulated parties are entitled to know with ascertainable certainty an agency's interpretation of its regulation.  Here, due to the lack of clarity and fair notice regarding WIS's obligations under Reg BI – in addition to the lack of clarity and fair notice regarding the SEC's interpretation of the regulation – WIS lacked fair notice that its conduct was prohibited.

WIS lacked fair notice that its conduct violated Reg BI because, among other

MORGAN, LEWIS & BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

62

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

things: (i) this is the first SEC action to enforce Reg BI, so there were no prior matters to consider in determining what Reg BI requires or how it should be enforced; (ii) the Complaint alleges that WIS violated standards that are not set forth anywhere in Reg BI or related SEC guidance, so WIS lacked ascertainable certainty as to the SEC's interpretation of Reg BI; (iii) the Complaint faults WIS for failing to engage in conduct that the SEC has explicitly said is not required; (iv) the SEC's interpretation of Reg BI in some instances is plainly erroneous and inconsistent with Reg BI and related guidance; and (v) the FINRA Exam Report underscores that WIS could not have known with ascertainable certainty that its policies allegedly violated Reg BI.  WIS will seek discovery from the SEC to support its fair notice defense.

## SECOND DEFENSE: VOID FOR VAGUENESS

Reg BI does not define "best interest" and is, on its face, void for vagueness. *See Matter of Indep. Ins. Agents & Brokers of N.Y., Inc. v N.Y. State Dep't of Fin. Servs.*, 195 A.D.3d 83, 87-88 (2021) (finding best interest regulation unconstitutionally vague because it "fails to provide sufficient concrete, practical guidance for producers to know whether their conduct, on a day-to-day basis, comports with the amendment's corresponding requirements for making recommendations and compiling and evaluating the relevant suitability information of the consumer").

## THIRD DEFENSE: GOOD FAITH

The Complaint's second claim for relief (i.e., control-person liability under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)) is barred because WIS acted in good faith and did not directly or indirectly induce the act or acts constituting the alleged violation or cause of action.  At all relevant times, WIS exercised due care in its supervision of the alleged violators' activities in that it developed, maintained, and enforced a reasonable system of supervision and internal controls in response to Reg BI.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WESTERN INTERNATIONAL SECURITIES INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

## FOURTH DEFENSE: SELECTIVE ENFORCEMENT IN VIOLATION OF FIFTH AMENDMENT EQUAL PROTECTION CLAUSE

By taking action against WIS for allegedly violating Reg BI, the SEC has intentionally treated WIS differently from other similarly situated broker-dealers, and there is no rational basis for the difference in treatment. This is the SEC's first action seeking to enforce Reg BI. The SEC has elected not to enforce the same requirements against other similarly situated broker-dealers, such as the approximately 145 broker-dealers engaged to sell L Bonds offered by GWG under the SEC's publicly stated standards. WIS will seek discovery from the SEC regarding its investigation into other broker-dealers selling L Bonds and communications with FINRA regarding Reg BI enforcement.

## FIFTH DEFENSE: NO LIKELIHOOD OF FUTURE VIOLATIONS

The relief requested in the Complaint is inappropriate, in whole or in part, because the Complaint fails to adequately allege a reasonable likelihood of future violations by WIS.

## SIXTH DEFENSE: RELIANCE ON OTHERS

The claims are barred, in whole or in part, because WIS relied upon the work, advice, professional judgment, and opinions of others upon which it was entitled to rely upon.

## SEVENTH DEFENSE: FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief may be granted.

## EIGHTH DEFENSE: ANY OTHER DEFENSE THAT MAY BECOME AVAILABLE

WIS hereby gives notice that it intends to rely upon any other defense that may become available or appear during the course of the litigation and hereby reserves the right to amend its Answer and to assert any additional defenses, cross-claims, counterclaims, and third-party claims as they become known or available.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

64

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

Dated: September 14, 2022          MORGAN, LEWIS & BOCKIUS LLP


By: */s/ Joseph E. Floren*
    Joseph E. Floren
    One Market Street
    Spear Street Tower
    San Francisco, CA  94105-1596
    Telephone: (415) 442-1391
    joseph.floren@morganlewis.com

    G. Jeffrey Boujoukos (*pro hac vice*)
    1701 Market Street
    Philadelphia, PA  19103-2921
    Telephone: (215) 963-5000
    jeff.boujoukos@morganlewis.com

    Jason S. Pinney (*pro hac vice*)
    Andrew M. Buttaro (*pro hac vice*)
    One Federal Street
    Boston, MA  02110-1726
    Telephone: (617) 341-7700
    jason.pinney@morganlewis.com
    andrew.buttaro@morganlewis.com

*Attorneys for Defendant Western International Securities, Inc.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

65

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2022, I electronically filed the above with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ *Joseph E. Floren*
Joseph E. Floren

Attorneys for Defendant
WESTERN INTERNATIONAL
SECURITIES, INC.

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

WESTERN INTERNATIONAL SECURITIES
INC'S ANSWER TO COMPLAINT
2:22-CV-04119-ODW