O

# United States District Court
# Central District of California

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　Plaintiff,<br><br>　　　v.<br><br>WESTERN INTERNATIONAL SECURITIES, INC. et al.,<br><br>　　　　Defendants. | Case № 2:22-cv-04119-ODW (AFMx)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION TO STRIKE AFFIRMATIVE DEFENSES [56]** |

## I.    INTRODUCTION

Plaintiff United States Securities and Exchange Commission ("SEC") brings suit against Defendant Western International Securities, Inc. ("Western") and five of its registered representatives for violating SEC Regulation Best Interest in connection with recommending and brokering the purchase of high-risk, illiquid L Bonds for Western's retail investor clients.  The SEC now moves to strike several of Defendants' affirmative defenses.  (Mot. Strike ("Motion" or "Mot."), ECF No. 56.)  Having carefully considered the papers filed in connection with the Motion, the Court deemed the matter appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.  For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** the SEC's Motion.

## II.      BACKGROUND

This matter concerns alleged violations by Western and five of its registered representatives of Regulation Best Interest, Rule 15*l*-1(a) of the Securities Exchange Act of 1934, 17 C.F.R. § 240.15*l*-1(a), in connection with offering L Bonds to Western's retail investor clients.  (Compl. ¶ 6, ECF No. 1.)  Western alleges that this is the SEC's first ever action to enforce Regulation Best Interest.   (Western Answer 63, ECF No. 45.)  The Court begins by discussing the purpose of Regulation Best Interest and the circumstances surrounding its adoption.

### A.      Regulation Best Interest

In 2010, Congress, by way of the Dodd-Frank Wall Street Reform and Consumer Protection Act, directed the SEC to investigate and adopt new rules regarding the appropriate standard of conduct to govern the relationship between broker-dealers and their customers.   Pub. L. No. 111-203, § 913, 124 Stat. 1376, 1824–30 (2010).  Nearly a decade of public debate on the topic followed.  *XY Plan. Network, LLC v. SEC*, 963 F.3d 244, 250 (2d Cir. 2020) (noting SEC received "over 6,000 comment letters . . . and held a series of 'investor roundtables'" to gather feedback on the proposed rule (quoting Regulation Best Interest: The Broker-Dealer Standard of Conduct, Exchange Act Release No. 34–86031 (June 5, 2019), 84 Fed. Reg. 33,318, 33,320, 2019 WL 3043879 (July 12, 2019) ("Adopting Release"))).  On June 5, 2019, as a result of these efforts, the SEC adopted Regulation Best Interest. 17 C.F.R. § 240.15*l*-1; *XY Plan.*, 963 F.3d at 249–50 (2d Cir. 2020) (discussing history of Regulation Best Interest).

Regulation Best Interest establishes a standard of conduct for broker-dealers and associated persons when they recommend securities transactions or investment strategies to retail customers.  Adopting Release, 84 Fed. Reg. at 33,318–19; (Compl. ¶ 43).  It does this by "enhanc[ing] the broker-dealer standard of conduct beyond existing suitability obligations, and align[ing] the standard of conduct with retail customers' reasonable expectations."   Adopting Release, 84 Fed. Reg. at 33,318.

Under Regulation Best Interest, broker-dealers must "[a]ct in the best interest of the retail customer at the time the recommendation is made," without placing the interest of the broker-dealer ahead of the interest of the retail customer. *Id.* The "best interest" standard is therefore more stringent than the previously applicable "suitability" standard, which required broker-dealers to "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer." FINRA Rule 2111(a); Adopting Release, 84 F.R. at 33,374 (discussing "existing suitability requirements" under FINRA Rule 2111). At the same time, the "best interest" standard is less stringent than the fiduciary standard that applies to registered investment advisers. *SEC v. Criterion Wealth Mgmt. Servs., Inc.*, 599 F. Supp. 3d 932, 949 (C.D. Cal. 2022).

Regulation Best Interest consists of four component obligations: (1) the Disclosure Obligation, (2) the Care Obligation, (3) the Conflict of Interest Obligation, and (4) the Compliance Obligation. 17 C.F.R. 240.15*l*-1(a)(2)(i)-(iv); (Compl. ¶ 46). This case involves alleged violations of the Care Obligation and the Compliance Obligation. (*See* Compl. ¶¶ 47–52.) The Care Obligation requires a broker-dealer to exercise reasonable diligence, care, and skill to, among other things, (1) understand the risks associated with a particular securities transaction, and (2) have a reasonable basis to believe that the recommended transaction is in the best interest of a retail customer, given that customer's specific investment profile and characteristics. 17 C.F.R. 240.15*l*-1(a)(2)(ii); (Compl. ¶¶ 47–49). The Compliance Obligation requires a broker-dealer to establish, maintain, and enforce written policies and procedures reasonably designed to achieve compliance with Regulation Best Interest. 17 C.F.R. 240.15*l*-1(a)(2)(iv); (Compl. ¶ 52).

In June 2019, the SEC issued a voluminous[1] adopting release regarding Regulation Best Interest. (Western Answer ¶ 5); *see* Adopting Release. The

---

[1] The SEC avers that the Adopting Release is 175 pages, (Compl. ¶ 44), whereas Defendants assert that it is 770 pages, (Individual Defs. Opp'n 4, ECF No. 60; Western Answer ¶ 5.).

compliance date for Regulation Best Interest was set for June 30, 2020, more than a year after the SEC adopted the Regulation, in order to provide an "opportunity for broker-dealers to comply with [Regulation Best Interest], including by creating or updating the necessary disclosures and . . . developing, updating or establishing their policies and procedures and systems, as appropriate, to achieve compliance with [Regulation Best Interest]." *Id.* at 33,400; (Western Answer ¶ 6).

**B.    L Bonds**

With this action, the SEC alleges that Defendants violated Regulation Best Interest when they recommended their retail investor clients invest in L Bonds. L Bonds were high-risk, illiquid corporate bonds[2] that paid fixed interest rates of between 5.5% and 8.5% and were available with two-, three-, five-, or seven-year maturity periods.  (Compl. ¶ 7.)

L Bonds were offered by GWG Holdings, Inc.  (*Id.*)  GWG is a financial services company whose business model prior to 2018 centered on acquiring life insurance policies in the secondary market.  (*Id.* ¶ 23.)  This involved purchasing life insurance policies from consumers who no longer wanted or needed their policies, continuing to pay the premiums, and collecting the policy benefits upon the insured's death.  (*Id.*)

In 2018 and 2019, GWG consummated a series of transactions with nonparty Beneficient, resulting in a significant reorientation of GWG's business model.  (*Id.* ¶ 24.)  In particular, Beneficient became a wholly owned subsidiary of GWG, and GWG stopped acquiring life insurance policies.  (*Id.*)  GWG now operates pursuant to Beneficient's business model, which is different.  (*Id.* ¶¶ 24–25.)

Since GWG began offering L Bonds in 2012, it has offered L Bonds in a total of four separate offerings.  (*Id.* ¶¶ 26, 28.)  The L Bonds relevant to this action are from GWG's fourth offering, which was an offering of up to $2 billion in L Bonds

---

[2] "A corporate bond is a debt obligation, like an 'IOU.'  Customers who buy corporate bonds are lending money to the company issuing the bond.  In return, the company promises to pay interest on the principal and to return the principal when the bond comes due, or 'matures.'"  (Compl. ¶ 27.)

that began in June 2020.  (*Id.* ¶ 28.)  In connection with this offering, GWG issued a forty-page prospectus that indicated that investing in L Bonds involves a "high degree of risk, including the risk of losing "one's entire investment[,]" and that "[i]nvesting in L Bonds may be considered speculative."  (*Id.* ¶¶ 31, 33.)  The prospectus further indicated that, due to the lack of a secondary market for L Bonds, they "are only suitable for persons with substantial financial resources and with no need for liquidity in [the] investment."  (*Id.* ¶ 34.)

GWG's largest tangible asset is its portfolio of life insurance policies, which as of December 31, 2019, had a face value of approximately $2 billion and a fair value of $796 million.  (*Id.* ¶ 39.)  However, L Bonds are not directly secured by GWG's life insurance portfolio.  (*Id.*)  Instead, they are primarily secured by GWG's equity ownership interests in certain GWG subsidiaries.  (*Id.*)  As a result, the claims of L Bond holders to any of GWG's assets, including its portfolio of life insurance policies, are subordinate to the interests of GWG's subsidiaries' creditors.  (*Id.*)  This is important because the fair value of GWG's life insurance portfolio, less the amounts GWG owes to its senior creditors, is insufficient to repay GWG's outstanding L Bond debt.  (*Id.*)

In January 2022, GWG became unable to meet its obligations and suspended further sales of L Bonds.  (*Id.* ¶ 41.)  On April 20, 2022, GWG filed for Chapter 11 bankruptcy.  (*Id.* ¶ 42.)  As a result, those who invested in L Bonds stand to lose a significant amount of their principal.  (*See id.* ¶ 84 ("[T]he value of GWG's life insurance portfolio was not sufficient to repay all of GWG's outstanding debt.").)

## C.   L Bond Purchases Recommended and Brokered by Western

The process by which Western recommended and executed the purchase of L Bonds for its investor customers comprised several steps and included several written forms.  Taken together, the forms enabled Western to collect information about the investor that might be pertinent to whether L Bonds were an appropriate investment.  Among other things, the customer would provide Western with the total

amount of alternative or illiquid investments the customer held and the percentage of the customer's liquid net worth that would be invested in alternative or illiquid investments after their L Bond purchase.  (*Id.* ¶ 61.)  The forms were then forwarded to a Western supervisor for review; the chief responsibility of the supervisor (or the supervisor's delegate) was to ensure the forms were completely filled out and to verify that the L Bond investment did not exceed 10% of the customer's net worth.  (*Id.* ¶¶ 62–63.)   Then, Western's compliance department would conduct an additional review to ensure that the forms were completely filled out and that an explanation was provided if the L Bond purchase exceeded 10% of the customer's net worth.  (*Id.* ¶ 64.)

Western received a commission of 3.25%–5% of the value of each L Bond, and the majority of this commission went directly to the registered representative who brokered the transaction.  (*Id.* ¶ 65.)  Between July 2020 and April 2021, the five registered representative Defendants in this matter each sold between $184,500 and $1,061,400 in L Bonds and each made corresponding commissions of between $5,397 and $32,424.  (*Id.* ¶ 69.)

Prior to offering L Bonds to Western's investor customers, Western's Chief Compliance Officer reviewed GWG's most recent Form 10-K and a due diligence report drafted by a third party.  (*Id.* ¶ 55.)  According to the Complaint, the Chief Compliance Officer did not provide the Due Diligence Report to Western's registered representatives, supervisors, or other compliance personnel.  (*Id.* ¶ 56.)  Moreover, the SEC alleges that, although Western's registered representatives took an online training course on L Bonds in the past, Western did not require them to take a second training course regarding the fourth L Bond offering, despite the significant changes in GWG's business model that had taken place by that time.  (*Id.* ¶¶ 58, 72.)

The SEC alleges further gaps in the knowledge and understanding Western's registered representatives possessed at the time they recommended L Bonds.  Some did not know that GWG's business model had changed, (*id.* ¶¶ 76–80), some did not

understand or acknowledge the high degree of risk associated with L Bonds, (*id.* ¶¶ 81–83), some did not understand that the L Bonds were junior to the claims of other creditors, (*id.* ¶¶ 84–85), and some did not know that Beneficient had a history of operating losses, (*id.* ¶¶ 86–89).

The Complaint sets forth facts regarding eight of Western's retail customers whom the SEC alleges have been harmed by Defendants' violations of Regulation Best Interest. (*Id.* ¶¶ 90–137.) The profile of Customer A is illustrative. Customer A was a 79-year-old truck driver with a moderate risk tolerance whose investment objectives did not include speculation. (*Id.* ¶¶ 93–94.) At the time of his L Bond purchase in November 2020, Customer A's annual income was $35,000 and his liquid net worth was $300,000. (*Id.*) Through Defendant Steven Graham, Customer A purchased $100,000 in two-year L Bonds for his individual retirement account, comprising 10% of his net worth and 33% of his liquid net worth. (*Id.* ¶¶ 93–95.)

**D.    The SEC's Suit**

On June 15, 2022, the SEC initiated this action against Western and five of its registered representatives: Nancy Cole, Patrick Egan, Andy Gitipityapon, Steven Graham, and Thomas Swan (the "Registered Representative Defendants"). The SEC's first claim is for violation of Regulation Best Interest and is asserted against all Defendants. (*Id.* ¶¶ 149–154.) The SEC's second claim is for control person liability under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), based on the Registered Representative Defendants' violations of Regulation Best Interest, and is asserted against Western. (*Id.* ¶¶ 155–158.) In addition to alleging that Defendants violated Regulation Best Interest in recommending and brokering the purchase of L Bonds for Western's customers, the SEC also alleges that Western's policies and procedures were insufficient to ensure that the Registered Representative Defendants understood the potential risks, rewards, and costs associated with L Bonds, or to ensure that investing in L Bonds was in the best interest of a given customer. (*Id.* ¶¶ 138–148.)

On September 14, 2022, all six Defendants answered the Complaint. (Answers, ECF Nos. 43–48.) As is relevant here, Western asserted the affirmative defenses of (1) lack of fair notice, (2) void for vagueness, (4) selective enforcement, (7) failure to state a claim, and (8) reservation of rights, (Western Answer 62–64), and each Registered Representative Defendant asserted the affirmative defenses of (1) failure to state a claim, (3) due process, (4) void for vagueness, and (8) reservation of rights,[3] (*see, e.g.*, Graham Answer 22–23, ECF No. 43). On October 5, 2022, the SEC filed the instant Motion, asking the Court to strike each of the foregoing affirmative defenses. (*See* Mem. ISO Mot. ("Mem."), ECF No. 57.) The Motion is fully briefed. (Individual Defs. Opp'n, ECF No. 59; Western Opp'n, ECF No. 60; Reply Individual Defs., ECF No. 62, Reply Western, ECF No. 63.)

## III.    LEGAL STANDARD

Under Rule 12(f) of the Federal Rules of Civil Procedure, a court may strike an affirmative defense if it is insufficient as a matter of law or if it is "redundant, immaterial, impertinent, or scandalous." Fed. R. Civ. P. 12(f). "To determine that a defense is insufficient as a matter of law, the court must be convinced that there are no questions of fact, that any questions of law are clear and not in dispute, and that under no set of circumstances could the defense succeed." *Ganley v. County of San Mateo*, No. C06-3923 TEH, 2007 WL 902551, at *1 (N.D. Cal. Mar. 22, 2007) (internal quotation marks omitted); *SEC v. Sands*, 902 F. Supp. 1149, 1165 (C.D. Cal. 1995).

The purpose of the motion to strike is "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010). That said, "[m]otions to strike are disfavored, in part because of the limited importance of pleadings in federal practice." *McGhee v. Tesoro Refin. & Mktg. Co.*, 440 F. Supp. 3d 1062, 1067 (N.D. Cal. 2020) (citing *Capella Photonics, Inc. v. Cisco*

---

[3] This affirmative defense is unnumbered in each of the Registered Representative Defendants' answers. The Court numbers this the eighth of the Registered Representative Defendants' affirmative defenses.

*Sys., Inc.*, 77 F. Supp. 3d 850, 858 (N.D. Cal. 2014)).  Reflecting this disfavor, some courts decline to strike affirmative defenses unless the plaintiff can show that it would suffer prejudice were the court to allow the defenses to stand.  *In re Honest Co., Inc. Secs. Litig.*, 343 F.R.D. 147, 151 (C.D. Cal. 2022).

"As with motions to dismiss under Rule 12(b)(6)" of the Federal Rules of Civil Procedure, "the court must . . . freely grant leave to amend when necessary." *Id.* (citing *Lee v. Hertz Corp.*, 330 F.R.D. 557, 560 (N.D. Cal. 2019)); *Kohler v. Staples the Office Superstore, LLC*, 291 F.R.D. 464, 467 (S.D. Cal. 2013) ("Unless it would prejudice the opposing party, courts freely grant leave to amend stricken pleadings." (citing *Wyshak v. City Nat'l Bank*, 607 F.2d 824, 826 (9th Cir. 1979))).

## IV.    DISCUSSION

The Court first considers Western's fair notice defense and the Registered Representative Defendants' due process defense together, because, for the purpose of this analysis, these two affirmative defenses are substantially the same.  (Mem. 5–9 (addressing these two affirmative defenses together); *see* Individual Defs. Opp'n 6 ("It is clearly established, both by common sense and by precedent, that due process requires fair notice of what conduct is prohibited . . . ." (quoting *Newell v. Sauser*, 79 F.3d 115, 117 (9th Cir. 1996))).)

## A.    Lack of Fair Notice (Western's First Affirmative Defense)/Due Process (Registered Representative Defendants' Third Affirmative Defense)

The SEC moves to strike Western's first affirmative defense (lack of fair notice) and the Registered Representative Defendants' third affirmative defense (due process).  "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citations omitted).  In a fair notice challenge, a court considers whether a law or regulation "fails to provide a person of ordinary

intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)); *see United States v. Approximately 64,695 Pounds of Shark Fins*, 520 F.3d 976, 980 (9th Cir. 2008) ("[I]n the absence of notice—for example, where the regulation is not sufficiently clear to warn a party about what is expected of it—an agency may not deprive a party of property by imposing civil or criminal liability." (quoting *Trinity Broad. of Fla., Inc. v. Fed. Commc'n Comm'n*, 211 F.3d 618, 628 (D.C. Cir. 2000))).

A party may challenge "the application of a regulation in a particular situation . . . on the ground that it does not give fair warning that the allegedly violative conduct was prohibited." *Phelps Dodge Corp. v. Fed. Mine Safety & Health Rev. Comm'n*, 681 F.2d 1189, 1192 (9th Cir. 1982). The parties appear to agree that Defendants' challenge to Regulation Best Interest is this type of "as-applied" challenge. (*See* Individual Defs. Opp'n 20–21 (analogizing to *Fed. Trade Comm'n v. LendingClub Corp.*, No. 18-cv-02454-JSC, 2020 WL 2838827 (N.D. Cal. June 1, 2020), and distinguishing *SEC v. Am. Growth Funding II, LLC*, No. 16cv00828 (KMW) (DF), 2016 WL 8314623 (S.D.N.Y. Dec. 30, 2016), on the basis that present case is "an as applied affirmative defense based on due process violations").) As such, the Court must consider "whether the challenged statute is unconstitutionally vague 'as applied to the particular facts at issue' such that the challenging party did not have sufficient notice that his or her conduct would be a violation of the statute." *Oracle USA, Inc. v. Rimini Street, Inc.*, 191 F. Supp. 3d 1134, 1148 (D. Nev. 2016) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18 (2010)). "This assessment cannot be conducted in the abstract . . . ." *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT) (SN), 2022 WL 748150, at *4 (S.D.N.Y. March 11, 2022).

The SEC cites case law supporting its contention that Regulation Best Interest and its Adopting Release, taken together, provided Defendants with fair notice and due process. (Mem. 5–6.) The SEC urges the Court to conclude at this early stage

that the fact that the SEC adopted Regulation Best Interest and issued an Adopting Release a year before the Regulation went into effect means that Defendants had fair notice as a matter of law.  (*Id.* at 6.)

Western, for its part, argues that it "has alleged that the SEC's Complaint accuses [Western] of violating standards that the SEC did not articulate anywhere in [Regulation Best Interest] or the adopting release."  (Western Opp'n 3 (citing Western Answer ¶ 1).)  In particular, Western alleges and argues that neither Regulation Best Interest nor its Adopting Release require broker-dealers to take the specific actions the SEC alleges were required in this case, such as sharing the L Bond due diligence report with Western's compliance personnel.  (Western Opp'n 14; Western Answer ¶ 31.)  Western argues that the absence of the alleged requirements in the Adopting Release is evidence that Western did not have fair notice that the alleged conduct was required.  (Western Opp'n 14.)  The Registered Representative Defendants make a similar argument.  (Individual Defs. Opp'n 17 ("[T]he SEC Complaint in this case alleges violations of [Regulation] Best Interest based on conduct that the Adopting Release specifically permits or does not require at all.").)

At this early stage of litigation, it is premature to conclude that, as a matter of law, the SEC provided Defendants with fair notice and due process with respect to Regulation Best Interest.  Factually, Defendants' as-applied fair notice/due process defense to Regulation Best Interest is based on (1) the underlying facts about the investment, and specifically the facts suggesting that L Bonds were an inappropriate investment, (2) what Defendants actually did or did not do to satisfy the Care Obligation and the Compliance Obligation.  Both of these areas of inquiry are in material factual dispute.  (Western Answer ¶¶ 36–39 (denying SEC's allegations that GWG and Beneficient had poor financial histories); Gitipityapon Answer ¶ 98, ECF No. 46 (denying SEC's allegation that Gitipityapon "did not know how Beneficient made its money or whether it was generating reviews and did nothing to determine if it was").)  If the facts about the soundness of the investment and the facts about

Defendants' actions are both in dispute, then the legal question of whether Defendants had fair notice that their actions violated a regulation under those facts is also in dispute. *Cf. Ripple Labs*, 2022 WL 748150, at *4 (rejecting motion to strike's challenge to as-applied fair notice defense, noting that ruling on defense would require court to first make the factual determination of "what Ripple *did* before assessing whether the statute fairly apprised Ripple that its conduct was prohibited").

Furthermore, the parties dispute which standard applies in determining how specific Regulation Best Interest must be to provide fair notice and comport with due process. The SEC argues that the test is "whether the defendant had fair notice of what the statute itself requires," (Mem. 5 (alterations and emphasis omitted)), and Western argues that, given that Regulation Best Interest is a rule and not a statute, the test is whether the rule provides "ascertainable certainty" of what it requires, (Western Opp'n 11–12). This is a disputed issue of law that is material to the success of the fair notice/due process defense. Thus, the Court does not find that the questions of law raised by the fair notice/due process defenses are "clear and not in dispute" such that under no set of circumstances could those defenses succeed. *Ganley*, 2007 WL 902551, at *1.

Finally, and more broadly, when a party challenges a regulation as applied, courts must "make a careful inquiry to determine the reasonableness of the administrative interpretation and application of the regulation." *Phelps Dodge*, 681 F.2d at 1192. This is a mixed question of fact and law, and in most cases, including this one, the court lacks sufficient information at the pleading stage to conclude that this inquiry will, in all possible scenarios, resolve in favor of the regulator. Instead, given that motions to strike require courts to "view the pleadings in the light most favorable to the nonmoving party," this particular issue often resolves in favor of the defendant, as it does here. *Ripple Labs*, 2022 WL 748150, at *5 (enumerating cases cited by the SEC in which the court refused to strike a fair notice affirmative defense at the pleading stage); *see In re Honest Co.*, 343 F.R.D. at 150,

153 ("[V]iewing the motion in the light most favorable to Defendants, the Court is unprepared at this point to conclude these defenses have 'no possible bearing on the subject matter of the litigation.'" (quoting *In re New Century*, 588 F. Supp. 2d 1206, 1220 (C.D. Cal. 2008))); *cf. Cholakyan v. Mercedes-Benz USA, LLC*, 796 F. Supp. 2d 1220, 1245 (C.D. Cal. 2011) (denying motion to strike class allegations as "premature" where defendant had not answered and discovery had not begun).

The fact that the SEC does not cite any securities regulation cases where a Court struck a fair notice/due process defense at the pleading stage confirms this conclusion. The Registered Representative Defendants pointed out the lack of precedent supporting striking these affirmative defenses, (Individual Defs. Opp'n 20 ("[T]he SEC has cited no caselaw where a court has stricken a fair notice affirmative defense at the pleadings stage, and the Court is not persuaded that doing so is appropriate here." (quoting *Ripple Labs*, 2022 WL 748150, at *5))), and in neither of its Reply briefs did the SEC rebut Defendants with relevant case law, (*see generally* Reply Western, Reply Individual Defs.).

Defendants' fair notice/due process defenses are colorable, such that it would be premature and improper at this stage to deny Defendants the ability to pursue and prove these defenses to the factfinder. Thus, the Court denies the SEC's Motion with respect to Western's first affirmative defense (lack of fair notice) and the Registered Representative Defendants' third affirmative defense (due process).

**B. Void for Vagueness (Western's Second Affirmative Defense; Registered Representative Defendants' Fourth Affirmative Defense)**

The SEC moves to strike Western's second affirmative defense and the Registered Representative Defendants' fourth affirmative defense, both of which seek to challenge Regulation Best Interest on the grounds that it is void for vagueness. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *United States v. O'Rourke*, 470 F. Supp. 2d 1049, 1062 (D. Ariz. 2007) ("A

statute is void for vagueness when it does not sufficiently identify the conduct that is prohibited." (quoting *United States v. Wunsch*, 84 F.3d 1110, 1119 (9th Cir. 1995))). *"*The void for vagueness doctrine reflects the principle that a statute which either forbids or requires the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." *Stevens v. Optimum Health Inst.— San Diego*, 810 F. Supp. 2d 1074, 1098 (S.D. Cal. 2011) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)).  Whether an enactment is void for vagueness may depend in part on whether the regulator has taken inconsistent positions regarding the regulation.   *Gay Men's Health Crisis v. Sullivan*, 733 F. Supp. 619, 641 (S.D.N.Y. 1989) (finding genuine dispute as to vagueness where regulator issued allegedly confusing and erroneous announcement regarding interpretation of regulation).

The SEC concedes that this defense "is simply another phrasing for the affirmative defense of Due Process/ fair notice."  (Mem. 10 (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972)); *see* Reply Individual Defs. 8.)  This concession is appropriate; if anything, the void for vagueness doctrine appears to be a specific application of constitutional due process requirements, such that this defense is simply a subset of Defendants' fair notice/due process defenses.  *See Grayned*, 408 U.S. at 108.  As discussed above, the Court declines to strike the fair notice/due process defenses.  The Court likewise declines to strike the void for vagueness defenses.

To the extent Defendants' void for vagueness defenses are not a subset of their fair notice/due process defenses—for example, if the void for vagueness defense is meant as a facial, rather than as-applied, challenge to Regulation Best Interest—the Court declines to strike the defenses.  The Court cannot make such a determination without the benefit of the full Regulation, the Adopting Release, and potentially other

documents.  Indeed, even the length of the Adopting Release is in dispute, and this basic dispute cannot be resolved on the current record.

Finally, to the extent Defendants' void for vagueness defenses may be duplicative of their fair notice/due process defenses, the Court nevertheless declines to strike them.  The SEC shows no additional prejudice that would arise from allowing Defendants to maintain a void for vagueness defense that does not already exist by virtue of the lack of notice and due process defenses.  If anything, the specificity of this defense provides the SEC with additional notice regarding the nature of the defense.  The Court sees no basis for striking this defense at this stage of litigation, and accordingly, the Court denies the SEC's Motion with respect to Western's second affirmative defense and the Registered Representative Defendants' fourth affirmative defense (void for vagueness).

## C.   Selective Enforcement (Western's Fourth Affirmative Defense)

The SEC moves to strike Western's fourth affirmative defense of selective enforcement.  Defendants in a civil enforcement action may raise the defense of selective enforcement as an "independent assertion" that the regulator has brought the enforcement action "for reasons forbidden by the Constitution."  *United States v. McGraw-Hill Cos., Inc.*, No. 2:13-cv-00779-DOC (JCGx), 2014 WL 1647385, at *11 (C.D. Cal. Apr. 15, 2014) (quoting *United States v. Armstrong*, 517 U.S. 456, 463 (1996)).  The requirements for such a defense "draw on 'ordinary equal protection standards.'"  *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)).  Selective enforcement generally requires a showing "(1) [t]hat others are generally not prosecuted for the same conduct; and (2) [t]he decision to prosecute this defendant was based upon impermissible grounds such as race, religion, or the exercise of constitutional rights," *Church of Scientology of Cal. v. C.I.R.*, 823 F.2d 1310, 1320–21 (9th Cir. 1987) (line breaks omitted), "or that there was no rational basis for the difference in treatment," *United States v. Gibson Wine Co.*, No. 1:15-cv-1900-AWI-SKO, 2016 WL 1626988, at *7 (E.D. Cal. Apr. 25, 2016).

Western does not allege or argue that the SEC's decision to single it out was based on Western's status as a member of a protected class or in retaliation for exercising its constitutional rights.  Instead, Western alleges and argues that there is no rational basis for the SEC's decision to single it out.  (Western Opp'n 18.)  Equal protection rights may be asserted by a "class of one" such as Western when the party asserting the right "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (holding that a lack of rational basis for differential treatment can give rise to an equal protection claim).  However, "some forms of state action . . . by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments."  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603 (2008).  Thus, a claim that a government agency abused its discretion in selectively enforcing a regulation against a class of one is generally available only "in truly horrendous situations."  *Baker v. Coxe*, 230 F.3d 470, 474–75 (1st. Cir. 2000); *see Alt. Cmty. Health Care Coop., Inc. v. Holder*, No. 11cv2585–DMS (BGS), 2011 WL 6216964, at *4 (S.D. Cal. Dec. 13, 2011) ("Selective enforcement of valid laws, without more, does not make Defendants' action irrational. However, the absence of rational basis can be shown if enforcement is malicious, irrational or plainly arbitrary." (cleaned up)).

As a preliminary matter, the parties dispute whether the familiar *Iqbal*/*Twombly* plausibility standard, or the less stringent "fair notice" standard, applies in determining whether Western sufficiently pleads its selective enforcement defense. (Mem. 3 ("Courts in this District are split on the whether to apply the *Twombly* and *Iqbal* pleading requirements to affirmative defenses, but at a minimum fair notice is required"); Western Opp'n 8 ("The plausibility standard of *Twombly* and *Iqbal* should not apply to [Western's] affirmative defenses.").)  The Court need not resolve this legal issue because the defense fails under either standard.  Western believes that the mere fact that it is the subject of the SEC's first-ever lawsuit to enforce Regulation

Best Interest means that it is the victim of selective enforcement.  (*See* Western Answer 64 ("The SEC has elected not to enforce the same requirements against other similarly situated broker-dealers, such as the approximately 145 broker-dealers engaged to sell L Bonds offered by GWG under the SEC's publicly stated standards.").)   Western alleges that these 145 other broker-dealers sold L Bonds through September 2021, (*id.* ¶ 27), and that, despite Regulation Best Interest having been in effect for more than two years, Western is the only broker-dealer that the SEC has sued in a federal court action alleging violation of Regulation Best Interest, (*id.* ¶¶ 27, 30; Western Opp'n 19).

These facts are insufficient as a matter of law to support a selective enforcement defense, and thus, the defense fails under both the *Iqbal*/*Twombly* plausibility standard and the more relaxed fair notice standard.  If merely enforcing a regulation for the first time means a regulator is guilty of selective enforcement, then the regulator could never successfully begin enforcing a new rule.  *Cf.  Alt. Cmty. Health Care*, 2011 WL 6216964, at *4 ("Selective enforcement of valid laws, without more, does not make Defendants' action irrational.").  Moreover, Congress has expressly granted the SEC broad discretion in determining when to investigate and bring enforcement actions.  15 U.S.C. § 77t(a)–(b); *see SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 745 (1984) ("Congress intended to vest the SEC with considerable discretion in determining when and how to investigate possible violations of the statutes administered by the Commission.").  Logically and practically, this necessarily includes discretion to bring an action to enforce a regulation for the very first time.

On the facts of this case as alleged, the SEC has a simple and rational basis for its "selective" enforcement, and that basis is that it has never enforced Regulation Best Interest in court before, meaning that, by definition, someone must be the first subject of an enforcement action.  Western may be that someone, but that fact alone, without more, does not entitle Western to a selective enforcement defense.  *See Engquist*, 553 U.S. at 603 ("[A]llowing an equal protection claim on the ground that a

[speeding] ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action."); *see also Lozman v. City of Riviera Beach*, 39 F. Supp. 3d 1392, 1416 (S.D. Fla. 2014) ("In the realm of . . . regulatory enforcement . . . an individual generally has no right to have the law go unenforced against him simply because others equally or more culpable than he have gone unpunished."); *Alt. Cmty. Health Care*, 2011 WL 6216964, at *4. Based on the facts and theory alleged, Western has no colorable basis for arguing that it was "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Olech*, 528 U.S. at 564; *Gibson Wine*, 2016 WL 1626988, at *8 (striking selective enforcement defense as insufficiently pleaded and noting defendant "offered no explanation of any impermissible purpose for the different treatment").

Moreover, were the Court to decline to strike this affirmative defense, the SEC would be significantly prejudiced. Western explicitly states its intention to conduct discovery on its selective enforcement defense, including discovery regarding the SEC's "investigation into other broker-dealers selling L Bonds." (Western Answer 64.) The SEC argues that it would be prejudiced by the selective enforcement defense because "the discovery Western admits it will seek is irrelevant, improper, and unduly burdensome." (Reply Western 8–9 (citing cases).) The Court agrees that these internal matters have nothing to do with the merits of the properly pleaded claims and defenses in this case, and the SEC would suffer significant prejudice were it "required to conduct expensive and potentially unnecessary and irrelevant discovery" on a "legally unsustainable affirmative defense[]." *Barnes v. AT&T Pension Benefit Plan—Nonbargained Program*, 718 F. Supp. 2d 1167, 1173 (N.D. Cal. 2010); *see Am. Growth Funding II*, 2016 WL 8314623, at *7 (disallowing affirmative defenses that would otherwise "force the SEC to give attention to matters collateral to its securities claims against Defendants"). Thus, even if prejudice is a

prerequisite to striking the selective enforcement defense, striking the defense is appropriate.

The Court grants the SEC's motion with respect to Western's fourth affirmative defense (selective enforcement).  Moreover, leave to amend this defense is denied.  The deficiency of the defense does not lie in the fact that Western fails to plead facts in sufficient quantity or detail.  Instead, Western's theory underlying this defense is legally insufficient.  Of course, if the ordinary course of discovery reveals a material, non-speculative basis for a selective enforcement defense, Western retains the right to move for leave to amend, subject to the applicable rules and procedural safeguards.

**D.  Failure to State a Claim (Western's Seventh Affirmative Defense; Registered Representative Defendants' First Affirmative Defense) and Reservation of Rights (Western's Eighth Affirmative Defense; Registered Representative Defendants' Eighth Affirmative Defense)**

Finally, the SEC moves to strike Western's seventh affirmative defense and the Registered Representative Defendants' first affirmative defense (failure to state a claim), along with Western's eighth affirmative defense and the Registered Representative Defendants' eighth affirmative defense (reservation of rights).

These last two challenges to the Answers make little to no difference in the context of the bigger picture of this case.  Although the parties argue alternatively that "failure to state a claim" and "reservation of rights" are or are not an affirmative defenses subject to being stricken, and cite cases where district courts did and did not strike such defenses, no one suggests that the outcome of this rather academic inquiry will have any material outcome on the proceedings—that is, that any party will be prejudiced.  *See In re Honest Co.*, 343 F.R.D. at 151 (noting motions to strike are "usually a waste of time and money without" a showing of prejudice (quoting Virginia A. Phillips & Karen L. Stevenson, *Rutter Group Practice Guide: Federal Civil Procedure Before Trial* § 9:376 (Cal. & 9th Cir. ed. Apr. 2022))).  For example, no party argues that the inclusion of "failure to state a claim" as an affirmative defense

would allow a defendant to circumvent the procedural requirements of Rule 12(b)(6) or 12(f) of the Federal Rules of Civil Procedure.  Similarly, no party argues that the inclusion of "reservation of rights" as an affirmative defense would allow a defendant to amend their answer to add defenses at will and without regard for the requirements of Rules 15(a)(2) and 16(b)(4) of the Federal Rules of Civil Procedure and the operative Scheduling and Case Management Order.  Therefore, and particularly in light of the general disfavor federal courts regularly express for motions to strike, *McGhee*, 440 F. Supp. 3d at 1067, the Court denies the SEC's Motion with respect to Western's Seventh Affirmative Defense and the Registered Representative Defendants' First Affirmative Defense (failure to state a claim) and Western's Eighth Affirmative Defense and the Registered Representative Defendants' Eighth Affirmative Defense (reservation of rights).

**E.    Discovery**

Given that the parties in their papers extensively addressed the effect of the outcome of this Motion on discovery, the Court makes a final clarification.  The parties should understand that the denial of the Motion with respect to the fair notice, due process, and void for vagueness defenses is without any prejudice to any determination by this Court or the assigned Magistrate Judge that certain discovery is or is not allowable or appropriate.  Discovery always remains subject to the relevance and proportionality requirements of Rule 26(b)(1) of the Federal Rules of Civil Procedure, no matter what affirmative defenses are pleaded.  By the same token, the granting of the Motion with respect to the selective enforcement defense does not mean that the Defendants are completely barred from any discovery that might relate to other broker-dealers.  Certain discovery may remain relevant after the disposition of this Motion, and other discovery may not.

///

///

///

## V.    CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's Motion to Strike.   (ECF No. 56.)   The Court **STRIKES** Western's fourth affirmative defense of selective enforcement **without leave to amend**.  The Court otherwise denies the Motion.


**IT IS SO ORDERED.**


March 13, 2023

_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**